Filed 10/13/25
See dissenting opinion

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JANE DOE et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> AMITA KACHRU, <br><br>     Defendant and Respondent. | A168669 <br><br> (San Francisco City & County Super. Ct. No. CGC-21-595416) |

## I. INTRODUCTION

Appellants Jane and John Doe allege they selected the medical facility where their child was born based on publications and marketing materials that led them to expect "privacy," "round-the-clock midwifery support," and delivery care consistent with "evidence-based, low-intervention care." However, when it came time for Jane to give birth, the Does allege none of the labor and delivery staff provided care consistent with these assurances. They claim to have suffered, and continue to suffer, traumatizing injuries from the difficult labor and birth.

The Does sued the hospital and most of the medical personnel involved in the birth, including respondent Dr. Amita Kachru. Kachru attended Jane

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III. D through G.

1

at the very end of her prolonged labor, after concerns about Jane's and the baby's condition arose, at which point Kachru allegedly told Jane she had two options, a cesarean section (C-section) or a vacuum-assisted vaginal delivery. Jane alleges she objected to both procedures and told Kachru she wanted to continue laboring. Kachru did not perform a C-section, but she did perform a vacuum-assisted delivery.

In their operative complaint, the Does alleged nine causes of action against Dr. Kachru, including for medical battery, gender violence, and abuse of a dependent adult. They did not allege Kachru was negligent or violated applicable medical standards of care. After the trial court sustained Kachru's demurrer to all claims against her except one, which the Does then asked be dismissed, the court entered a judgment of dismissal from which the Does now appeal. Except as to Jane's medical battery claim, we affirm.

## II. BACKGROUND

Because this case comes to us following the sustaining of a demurrer without leave to amend, we must accept as true the well-pleaded allegations in the Does' (fifth amended) complaint. " ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." ' " (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 6.) However, a demurrer "does not admit contentions, deductions or conclusions of fact or law in the challenged pleading." (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 459, citing *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

As to Dr. Kachru, the Does alleged in pertinent part as follows:

The Does wanted a birth experience that afforded "privacy," was based on "the American College of Nurse Midwives . . . model of evidence-based,

2

low-intervention care," and provided "round-the-clock midwifery support," including support for a multitude of pushing positions, for freedom of movement, and for non-pharmacologic pain relief.

In printed and Internet publications, including its Web site, in Facebook pages, and in YouTube videos, defendant Sutter Health stated it endorsed and would provide this kind of birth experience.  For example, a handout, under the heading " 'Appropriate Intervention,' " stated, " 'Our group is committed to honoring pregnancy as a largely healthy, natural process that usually requires little to no intervention from your medical team.  We don't perform procedures or recommend interventions universally, but tailor them to what's needed on an individual basis.' "  It also stated, " 'Doctors and midwives participate equally in the care of all patients. Midwives are experts in low risk and uncomplicated pregnancy and childbirth, while MDs are available 24/7 if things become more complicated.' " Accordingly, the couple chose Sutter's Mission Bernal Women's Center for Jane's prenatal care and delivery.  Due to the Covid-19 pandemic, the venue was later changed to another Sutter facility, the CPMC Birth Center, Van Ness campus.

Jane went into labor on October 19, 2020, when she was 39 weeks pregnant.  "Throughout the day," the couple monitored Jane's contractions, and "in the 8:00 p.m. hour," Jane called the birth center.  After "observing her labor by phone," medical staff told her to come to the hospital.  The couple therefore traveled the approximately 50 miles to the hospital.

When Jane was finally taken to the obstetrics triage area, she spoke with the person to whom she had spoken on the phone.  This person told her she could agree to the administration of morphine and remain at the hospital,

3

or return home. Because she did not want to make the trip home, Jane "acquiesced to" the administration of morphine.

After awhile, a certified nurse-midwife told Jane that even though her contractions "were regular," her cervix had not dilated sufficiently "for a hospital stay" and therefore she could not remain at the hospital unless she agreed to "a membrane sweep or Pitocin." Although "[n]o one explained to the Does why such interventions were recommended," Jane "acquiesced" to a membrane sweep in order to remain at the hospital.

Despite the procedure, Jane's cervical dilation was only three centimeters, still insufficient to remain at the hospital. So, over her objection, but with the approval of the physician who had "cared for [her] during her prenatal course," she was discharged the following morning to return home. She was in "unbearable" pain during the drive back and vomited on the way.

"Sometime later," after the couple returned home, Jane again spoke with staff at the birth center, who said she could return. When she arrived at the hospital, there was again a "very long intake process." The amended complaint includes no allegations as to the contents of the admitting documents and authorization to treat forms.

Jane was taken to the obstetric triage area, and then to a labor-delivery-recovery room where she expected to be cared for in accordance with Sutter's assurances of privacy, round-the-clock midwifery support, and low-intervention care. The room was "extremely cold," and she was placed under blankets. But the blankets were repeatedly partially removed for the "many" vaginal examinations staff performed and as to which she had no opportunity to object. During one of the exams, a certified nurse-midwife ruptured Jane's membrane with her fingers, a procedure to which Jane had no opportunity to

4

object.  The nurse-midwife observed the amniotic fluid "had meconium staining" but said there "was no reason not to anticipate a normal vaginal delivery."

Jane's labor continued, and her cervix eventually dilated to 10 centimeters.  However, another certified nurse-midwife stated the "cervical lip was still on one side of the baby's head" and proceeded to move it.  The nurse-midwife did not say why this "was necessary" or obtain Jane's consent to do so.

Jane was then told to "start pushing," although she had no urge to do so.  At that point, the Does wanted to talk about their birth plan with the medical staff, but staff did not engage with them.

One of the certified nurse-midwives told Jane to lie on her back.  Jane did not want to do so and said her prenatal providers had "agreed" "she could push and birth in any position that her body needed."  After discussing the issue, the nurse-midwives again told her to lie on her back.  One of the providers was concerned she could not otherwise "see well or feel" Jane's contractions.

One of the nurse-midwives then told Jane "a pediatrics team" would be coming into the room.  Jane objected, saying she wanted "privacy" and "only a minimum number of people" in the room.  The nurse-midwife told her the team would wait behind the door privacy curtain.

Shortly after this, a "new clinical team" entered the room.  This included Dr. Kachru, who immediately approached Jane and said they (the new medical team) would " 'take over now.' "  Kachru also said "they were going to do a C-section, 'now.' "  Jane objected and asked, " 'Why?' "  Kachru replied that Jane had "developed a slight fever" and "the baby's heart rate had increased."  Jane again said she did not " 'want this,' " and wanted "to

5

continue pushing" and give birth vaginally. Kachru said the "only way" to "avoid a C-section" was by "a vacuum-assisted delivery." Jane said, " '[n]o.' " Kachru repeated that was the only way to avoid a C-section. Jane again refused.

At that point, "[s]omeone" performed an ultrasound and the pediatrics team was called into the room. Jane objected, saying she wanted "privacy" and there had been a "plan" for that. Dr. Kachru said the team could stand behind the baby warming station and "look away" during the birth. Jane continued to object and said only the pediatrician could enter the room and "[e]veryone else" had to wait behind the curtain.

"All of a sudden," the lights in the room, which had been dimly lit, were turned on and glaringly bright. "Unknown people" entered the room; no one remained behind the curtain. Two unknown persons placed Jane's legs in the bed stirrups and, "[w]ithout permission," removed her socks. Dr. Kachru, seated between Jayne's legs, performed a vacuum-assisted delivery. The procedure was extremely painful, and the baby was born, apparently with no ill effects as none are alleged in the complaint.

Dr. Kachru then "forcibly removed Jane's placenta" by pressing on Jane's abdomen without obtaining Jane's consent. After that, Kachru inserted a catheter into Jane's urethra, without Jane's consent. Kachru then gave Jane an injection and "started suturing," without Jane's consent. Jane continually complained of pain, but neither Kachru nor anyone else responded. After completing the sutures, Kachru asked Jane if she wanted "an IUD." Jane declined, and Kachru did not insert one. Kachru then removed the catheter and left.

Jane has been diagnosed with "acute stress reaction and Postpartum Post-Traumatic Stress Disorder" and continues to suffer its disabling effects.

She has also been diagnosed with "pudendal nerve neuralgia, vaginal burning, pelvic floor dysfunction, and muscle spasticity." These conditions preclude her from doing "activities in the way that they were done before" the birth. Pain from these conditions "can flare up unpredictably, intermittently, and randomly," and when they do, trigger her PTSD. The couples' marital relationship has suffered, and John Doe has suffered "his own psychological trauma."

The Does subsequently filed the instant action, naming as defendants Sutter Health, Dr. Kachru and two other doctors, four midwifery specialists, and two nurses, and alleging numerous causes of action. In the fifth amended, and operative, complaint, Jane alleged the following causes of action against Kachru: medical battery, "gender violence" in violation of Civil Code section 52.4, abuse of a dependent adult in violation of the Elder Abuse and Dependent Adult Civil Protection Act (Welf. & Inst. Code, § 15600 et seq., hereafter the Elder Abuse Act), false imprisonment, violation of California's constitutional right to privacy, and common law invasion of privacy. In addition, Jane and John both alleged causes of action for intentional infliction of emotional distress, fraudulent deceit, and negligent misrepresentation, and John alleged a cause of action for loss of consortium. Although the Does alleged a cause of action for medical malpractice against other defendants, they did not allege such a cause of action against Kachru.

Dr. Kachru interposed a demurrer to all causes of action asserted against her, which the trial court sustained without leave to amend except as to John Doe's loss of consortium claim. At the Does' request the trial court also dismissed that claim and thereafter entered a judgment of dismissal.[1]

---

[1] The Does have not pursued their fraudulent deceit and negligent misrepresentation claims on appeal.

7

### III. DISCUSSION[2]

#### A. Medical Battery

Pointing to their allegations of unauthorized examinations and procedures, the Does maintain the trial court erred in sustaining Dr. Kachru's demurrer to Jane's cause of action for medical battery. We agree in one respect—that Jane's allegations are sufficient to state a medical battery claim based on Kachru performing the vacuum-assisted delivery over Jane's objection.

#### *Governing Law*

"Our Supreme Court has distinguished between 'two qualitatively different types' of medical battery. (*Larson* [*v. UHS of Rancho Springs, Inc.* (2014)] 230 Cal.App.4th [336,] 349 [discussing *Cobbs v. Grant* (1972) 8 Cal.3d 229 . . . (*Cobbs*)].) The first, an intentional tort, 'occurs when a physician obtains the patient's consent to perform one type of treatment, but performs a substantially different treatment for which the plaintiff gave no consent.' (*Larson*, at p. 349.)" (*Burchell v. Faculty Physicians & Surgeons etc.* (2020) 54 Cal.App.5th 515, 523–524 (*Burchell*).) "The second type 'occurs when a physician performs the treatment for which consent was obtained and an

---

[2] Our standard of review is well settled. "After assuming the truth of the allegations in the complaint, facts that can be inferred from those pleaded, and judicially noticed matters [citation], 'we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory.'" (*Fierro v. Landry's Restaurant Inc.* (2019) 32 Cal.App.5th 276, 286.) We do not consider "extraneous facts" not set forth in the complaint (*Yamaha Motor Corp. v. Paseman* (1990) 219 Cal.App.3d 958, 963, fn. 2), and "we review the trial court's ruling, not the reasons stated for the ruling." (*Fierro, supra*, at p. 286.) When the trial court sustains a demurrer without leave to amend, "we must decide whether there is a reasonable possibility the plaintiff could cure the defect with an amendment." (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 (*Schifando*).) The plaintiff bears the burden in this regard. (*Ibid.*)

infrequent complication occurs that the physician failed to disclose when obtaining the patient's consent.' (*Larson, supra*, 230 Cal.App.4th at p. 349.) 'In that circumstance, the claim is based on professional negligence, not intentional misconduct, because the physician did not deliberately deviate from the consent, but merely failed to disclose all known potential complications.' (*Ibid.*)" (*Burchell,* at p. 524.)  In short, "[t]he battery theory should be reserved for those circumstances when a doctor performs an operation to which the patient has not consented." (*Cobbs,* at p. 240.)

Thus, the question before us is whether Jane alleged the requisite intentional tort and thus stated a claim for medical battery, rather than medical negligence.

"A physician who performs any medical procedure without the patient's consent commits a battery irrespective of the skill or care used." (*Thor v. Superior Court* (1993) 5 Cal.4th 725, 735 (*Thor*); accord, *Burchell, supra,* 54 Cal.App.5th at p. 525 ["[t]he elements of a medical battery claim do not involve a jury determination as to whether the standard of care was violated"].)  "A typical medical battery case is where a patient has consented to a particular treatment, but the doctor performs a treatment that goes beyond the consent. . . .  For example, the patient consents to an electromyogram, a relatively uncomplicated procedure, but the doctor performs a myelogram, which involves a spinal puncture.  [Citation.]  Or, the patient consents to an operation on his right ear, but the doctor operates on the left ear." (*Conte v. Girard Orthopaedic Surgeons Medical Group, Inc.* (2003) 107 Cal.App.4th 1260, 1267 (*Conte*).)

But not any deviation from consented-to medical treatment will sustain a medical battery claim—rather, the treatment given, or procedure performed, must be " 'substantially different' " than that for which informed

9

consent was given.  (*Conte, supra,* 107 Cal.App.4th at p. 1267; accord, *Burchell, supra,* 54 Cal.App.5th at p. 524, quoting *Cobbs, supra,* 8 Cal.3d at p. 239.)  Whether a treatment or procedure is " 'substantially different' " from that for which consent has been given, may, "[i]n the absence of any definitive case law," be a factual issue involving expert testimony.  (*Kaplan v. Mamelak* (2008) 162 Cal.App.4th 637, 647 (*Kaplan*).)

Accordingly, "[i]n the medical battery context, the scope of the consent is important because the gist of such battery is that the doctor has intentionally touched the patient without consent or in a manner that exceed[ed] the consent and without justification."  (*Conte*, *supra*, 107 Cal.App.4th at p. 1268; see, e.g., *Kaplan, supra,* 162 Cal.App.4th at pp. 639–640, 645 [patient signed consent form to operate on disk T8-9, described as a " 'thoracic eight-nine transvers pedicular diskectomy,' " but surgeon mistakenly operated on disks T6-7 and T7-8].)  "Consent to medical care . . . may be express or may be implied from the circumstances." (*Bradford v. Winter* (1963) 215 Cal.App.2d 448, 454 (*Bradford*).)  Consent can also be "conditional."  (*Ashcraft v. King* (1991) 228 Cal.App.3d 604, 609–610 [patient's consent to surgery was "subject to a specific condition: only family donated blood would be used," but no family blood was used and some of the blood used was contaminated with the HIV].)

"[A] doctor may act beyond the patient's express authorization," however, "in 'life-or health-threatening situations.' "  (*Burchell, supra,* 54 Cal.App.5th at p. 525; see CACI No. 554 ["Affirmative Defense— Emergency"].)  "[I]n an emergency[,] consent is implied."  (*Cobbs, supra,* 8 Cal.3d at p. 243.)

***Only the Allegations Pertaining to the Vacuum-Assisted Delivery***
***Suffice to State a Medical Battery Claim***

We first consider the nature of Jane's medical battery claim. The Does maintain she pleaded a "no-consent" battery claim apparently meaning, in light of the allegations of the operative complaint, it was Jane's prerogative to accept or reject any examination or procedure during her labor and delivery that involved touching her and was allegedly uncomfortable or painful. Dr. Kachru contends, in contrast, that because Jane made no objection to a physician delivering her baby, but now complains she was confronted with the choice of a C-section or vacuum-assisted vaginal delivery, her battery claim was pled as one of "conditional consent," i.e., you can deliver my baby but only if you refrain from performing a C-section or a vacuum-assisted delivery. Kachru then adds that Jane's alleged statement—" 'I do not want this!' "— was inadequate to communicate a lack of consent to a vacuum-assisted delivery, especially since Jane was otherwise compliant with medical staff while they prepared for the delivery.

While the trial court agreed with Dr. Kachru that the Does had not sufficiently pleaded a medical battery claim, it did so for a reason different than advocated by Kachru. As the court saw it, Jane consented to admission to the hospital for the delivery of her baby and did not allege any "intentional deviation from the consented treatment for childbirth."

We do not agree with either party's characterization of Jane's medical battery claim. Nor do we agree with the trial court's conclusion that, as a matter of law, none of the procedures Dr. Kachru allegedly performed even arguably amounted to a "substantial deviation" from Jane's authorization of obstetric care when she entered the hospital.

11

This is not a "no-consent" case as the Does argue because Jane necessarily consented to care and treatment during her labor and delivery in voluntarily seeking admission to the hospital, and there is no allegation she refused obstetric care by a physician. Indeed, as we have recited, the Does alleged that one of the hospital's publications they relied on in choosing Sutter stated, " 'Doctors and midwives participate equally in the care of all patients. Midwives are experts in low risk and uncomplicated pregnancy and childbirth, while MDs are available 24/7 if things become more complicated.' " Nor is this a "conditional" consent case, as Dr. Kachru maintains. The Does did not allege Jane consented to physician-assisted delivery on the condition delivery be unaided by any surgical or mechanical technique—they alleged Jane, when presented at the eleventh hour with the choice to have either a C-section or vacuum-assisted vaginal delivery, expressly and unequivocally refused both.

Thus, as the trial court recognized, the essence of Jane's medical battery claim with respect to Dr. Kachru is that the alleged procedures she performed exceeded the scope of the authorization Jane gave for obstetric care on entering the hospital. More specifically, the question at this juncture is whether Jane alleged that Kachru performed any procedure " 'substantially different' " than those for which consent was given. (*Conte*, *supra*, 107 Cal.App.4th at p. 1267; accord, *Burchell, supra,* 54 Cal.App.5th at p. 524.) We conclude they do not, except for Jane's allegations with respect to the vacuum-assisted delivery.

We agree with the trial court that by voluntarily admitting herself into the hospital for the purpose of concluding labor and giving birth, Jane impliedly consented to medical staff providing care and performing procedures generally associated with obstetric care, some of which would

12

involve staff touching her.  In the case of Dr. Kachru, this included vaginal touching, performing an episiotomy, aiding expulsion of the placenta, draining urine with a catheter, giving an injection (the drug injected is not identified in the complaint), and making a perineal laceration and suturing it.

Specifically, the Does maintain the trial court erred in relying on *Bradford, supra,* 215 Cal.App.2d 448, in concluding these procedures at the time of delivery and immediately thereafter do not support a cause of action for medical battery.  The case does not, however, support the Does' claim.

In *Bradford,* the plaintiff consented to a surgical procedure to diagnose whether a lesion was cancerous.  (*Bradford, supra,* 215 Cal.App.2d at pp. 450–451.)  Because "[a]n unexpected sudden massive hemorrhage" occurred during the procedure, the physician said it was in the plaintiff's best interest to undergo surgery, and the plaintiff agreed.  (*Id.* at pp. 451–452.)  When surgery revealed the spread of cancer, the doctor excised the plaintiff's right lung.  (*Id.* at p. 452.)  The appellate court *affirmed* judgment for the physician, concluding the scope of the plaintiff's consent encompassed the surgery.  (*Id.* at pp. 450, 454–455.)  In other words, the lung removal was not "substantially different" from the procedure to which the plaintiff had consented.

So, too, here.  The vaginal touching by Dr. Kachru and the enumerated procedures she performed at the moment of birth and immediately thereafter were not "substantially different" from the general labor and delivery care Jane authorized on admission to the hospital.  (See *Bradford, supra,* 215 Cal.App.2d at p. 454 [biopsy considered "normal incident of a bronchoscopy"].)  Indeed, were we to adopt the Does' proposed standard, obstetric providers would have to obtain express consent for every

13

uncomfortable touching and every procedure generally associated with labor and delivery.  This does not, however, comport with our state's established tort law governing medical battery.  Nor with that in other jurisdictions.  (See *Bronneke v. Rutherford* (Nev. 2004) 89 P.3d 40, 43 [" 'as a practical matter, health professionals cannot be required to obtain express consent before each touch or test they perform on a patient' "]; see also *Devitre v. Orthopedic Center of St. Louis, LLC* (Mo. 2011) 349 S.W.3d 327, 335 [although patient alleged he told doctor to stop touching him during examination because of pain, complaint did not plead an unconsented touching].)

Other out-of-state cases cited by the Does do not suggest otherwise.  In *Schloendorff v. New York Hospital* (1914) 211 N.Y. 125, 128 (*Schloendorff*), for example, the plaintiff alleged she consented to general anesthesia for the examination of a fibroid tumor but the physicians proceeded to surgically remove the tumor, even though the plaintiff had expressly stated "there must be no operation."  An "examination," ruled the court, is wholly different from an "operation."[3]  (*Schloendorff,* at pp. 129–130.)  In *Mohr v. Williams* (Minn. 1905) 104 N.W. 12, 13, the patient consented to surgery on one ear, but the surgeon decided, while the patient was under anesthesia and without prior consent, to perform surgery on the other ear.[4]  Neither case is similar to the case at hand.

---

[3]  The court also observed the scenario alleged was "improbable" but assumed it was true because the appeal was taken from a directed verdict in favor of the defendant hospital.  (*Schloendorff, supra,* 211 N.Y. at p. 128.)  The court ultimately held the hospital was not liable since it was a charitable institution.  (*Id.* at p. 135.)  The case was later overruled on that point by *Bing v. Thunig* (1957) 2 N.Y.2d 656, 667–668 (conc. opn. of Conway, J.).

[4]  *Mohr* was overruled on another ground by *Genzel v. Halvorson* (Minn. 1957) 80 N.W.2d 854, 859.

14

Nor does *Burchell* assist the Does. To the contrary, it also supports our conclusion that, other than the vacuum-assisted delivery, there is no basis for a medical battery claim against Dr. Kachru. In *Burchell,* the patient agreed to surgery to remove a mass in his scrotum. However, during the surgery, the surgeon discovered the mass extended to the penis, so he removed it despite knowing that would render the patient impotent. (*Burchell, supra*, 54 Cal.App.5th at pp. 519–520.) In explaining why this constituted medical battery rather than medical malpractice, the court explained it was not a case where the battery "arose from failure to disclose an infrequent complication of a consented-to procedure," which would sound in negligence. (*Id.* at p. 525.) Instead, the surgeon "performed a substantially different treatment" than that consented to, which amounted to "the performance of an unexpected and unconsented-to procedure." (*Id.* at p. 526.)

However, vaginal touching immediately prior to birth and the procedures Dr. Kachru performed at the moment of birth and immediately thereafter cannot be described as "substantially different" treatment than general obstetric care authorized on being admitted to a medical facility. While Jane alleged the vaginal touching and other procedures were painful and some were unnecessary (she argues, for example, there was no need to "forcibly" press on her abdomen to expel the placenta), these are allegations that might arguably support a claim the procedures were not performed in accordance with the standard of care, but that is not a cause of action Jane ever advanced.

And that was the issue in *Cruz Flores v. Ryder Memorial Hospital, Inc.* (2022) 210 D.P.R. 465, on which the Does also rely. In that case, the Supreme Court of Puerto Rico upheld a *medical malpractice* claim against the hospital based on the obstetric provider inducing labor four weeks early

15

because the provider planned to be on vacation when the baby reached full term.  (*Cruz Flores*, 2022 PR Sup. LEXIS 163, \*17 [official translation].)  As the Does note, the concurring and dissenting opinion expressed great concern about the consequences a woman may suffer because of an unnecessary C-section.  (*Id.* at p. \*70 (conc. & dis. opn. of Oronoz Rodríguez, C.J.).)  We have no quarrel with this concern.  However, beyond the fact we are not dealing here with an unauthorized C-section, the salient point is that *Cruz Flores* was a *medical malpractice* case in which the issue was whether failure to obtain informed consent fell below the standard of care, not whether a medical battery had been committed.[5]  (*Id.* at pp.\*36–\*37.)

---

[5]  We are aware of scholarly articles highly critical of the maternity and infant mortality rate in this country and the degree to which labor and childbirth has become viewed as a medical event, rather than a naturally occurring part of the human lifecycle.  (E.g., Alexa Richardson, *The Case for Affirmative Consent in Childbirth* (2022) 37 Berkeley J. Gender L. & Just. 1; Hindi E. Stohl, M.D., J.D., *When Consent Does Not Help: Challenges to Women's Access to a Vaginal Birth After Cesarean Section and the Limitations of the Informed Consent Doctrine* (2017) 43 Am.J.L. & Med. 388; Elizabeth Kukura, *Contested Care: The Limitations of Evidence-Based Maternity Care Reform* (2016) 31 Berkeley J. Gender L. & Just. 241.)  What is particularly notable for purposes of the instant case, however, is that these articles largely recognize that current tort law does not provide recourse for the kind of claims Jane mostly alleges here, which on final analysis, are based on the labor and delivery medical staff's alleged disregard of her birth plan, in which she made it clear she wanted privacy during labor and delivery, constant midwifery support, choices about positioning, and low-intervention care.  (E.g., *The Case for Affirmative Consent in Childbirth, supra*, 37 Berkeley J. Gender L. & Just. at pp. 17–19; *When Consent Does Not Help: Challenges to Women's Access to a Vaginal Birth After Cesarean Section and the Limitations of the Informed Consent Doctrine, supra*, 43 Am. J.L. & Med. at pp. 423–424; *Contested Care: The Limitations of Evidence-Based Maternity Care Reform, supra,* 31 Berkeley J. Gender L. & Just. at pp. 296–297.)  And while these articles urge that women, consistent with their right to bodily integrity and right to choose and refuse medical care, must be

16

Jane's allegations with respect to the vacuum-assisted delivery, however, stand on different footing. As we have pointed out, this matter is before us after the sustaining of a demurrer without leave to amend. Accordingly, all we have before us are *allegations* of a medical procedure that at least arguably was substantially beyond the scope of Jane's general authorization of obstetric care on admission to the hospital. It may well be that evidence will establish that a vacuum-assisted vaginal delivery is not "substantially different" than the general obstetric care Jane authorized. But that is not a conclusion we can make at this time as a matter of law. (See *Kaplan, supra,* 162 Cal.App.4th at p. 647 [improper to sustain demurrer because whether surgery on wrong disk was a reasonable risk of the surgery and thus came within the scope of the consent given was a factual question].)

It may also well be that Dr. Kachru reasonably concluded an emergency situation had developed that required immediate delivery of the child. Indeed, the complaint alleges Jane's labor had persisted for nearly two

---

accorded more control over their labor and birthing experience, including refusing procedures urged by attending medical staff, they also largely acknowledge this will require statutory change, including insulating obstetric providers from liability when the woman's choices about care and interventions have negative consequences for her or her child. (E.g., *The Case for Affirmative Consent in Childbirth, supra*, 37 Berkeley J. Gender L. & Just. at pp. 22–24, 48–49 ["the proposed affirmative consent legislation must provide for a legislated waiver of liability for the provider"]; *When Consent Does Not Help: Challenges to Women's Access to a Vaginal Birth After Cesarean Section and The Limitations of the Informed Consent Doctrine, supra*, 43 Am. J.L. & Med. at p. 424 [women seeking expanded access to vaginal delivery after previously having a C-section "should consider lobbying for malpractice reform as an important avenue to increase provider's willingness to offer this procedure"].) Any such change in our tort law entails philosophical and political discourse well outside our province as an intermediate appellate court charged with applying the law as it currently stands.

days and arguable complications had arisen, i.e., Jane had developed a slight fever, the baby had developed an elevated heartrate, and Kachru stated the baby was going to be delivered " 'now,' " and the " 'only' " way to avoid a C-section at that point was a vacuum-assisted vaginal delivery.  But given the limited factual matrix before us—none of which pertains to Kachru's affirmative defense—we cannot at this point in the proceedings conclude as a matter of law that there was, in fact, an emergency requiring Kachru to disregard Jane's refusal of a vacuum-assisted delivery.

We hasten to add that our conclusion in this regard is not based on the broad proposition advanced by the Does in their briefing that Jane had an absolute right to refuse any medical intervention no matter what consent she had previously given or how medically necessary—even if, as Does' counsel urged at oral argument, her refusal would result in injury to herself or her baby.  To begin with, this assertion is contrary to this state's established law of medical battery, which recognizes that to be actionable the complained-of medical care or treatment must have been "substantially different" from that for which consent was given, and further recognizes that in a medical emergency consent is implied.

The Does are also misguided in their reliance on caselaw involving incarcerated and institutionalized patients, wherein courts have ruled some patients can refuse medical treatment even when doing so will lead to their death.  In *Thor, supra*, 5 Cal.4th 725, for example, cited by the Does, a quadriplegic prison inmate risked death after refusing food and medical care. (*Id*. at p. 732.)  The prison's treating physician sought an ex parte order allowing forced feeding and medication.  (*Id*. at p. 733.)  In evaluating the propriety of such an order, our Supreme Court was called on to determine "whether the right to 'exercise of control over [one's] body' is sufficiently

18

broad to permit an individual to decline life-sustaining treatment, even if to do so will cause or hasten death." (*Id.* at p. 732.) "[F]ully appreciative of the profound considerations, both philosophical and personal, at issue," and "[a]fter due deliberation," the court held "under California law a competent, informed adult has a fundamental right of self-determination to refuse or demand the withdrawal of medical treatment of any form irrespective of the *personal* consequences." (*Ibid.*, italics added.) It further held that in "the absence of evidence demonstrating *a threat to* institutional security or public safety, prison officials, including medical personnel, have no affirmative duty to administer such treatment and may not deny a person incarcerated in state prison this freedom of choice." (*Ibid.,* italics added.)

The case before us bears no similarity to the circumstances in *Thor*. And more importantly, the Supreme Court held only that the *personal* consequences to an inmate of refusing food or medical treatment are insufficient to justify forced treatment, pointing out there was no evidence of *a threat* to *other* inmates and personnel (i.e., to institutional security). Here, it was not just Jane's *personal* interests at stake; her full-term baby's interests were also at stake. And, thus, unlike in *Thor,* the Does' complaint alleged a *threat* to someone *other* than Jane. In short, the analytical rubric that is brought to bear with respect to inmates and incapacitated patients in custodial settings is not determinative of the case at hand. (See, e.g., *Bouvia v. Superior Court* (1986) 179 Cal.App.3d 1127, 1134, 1136–1137 [competent but immobile patient at public hospital had right to refuse life-sustaining medical treatment]; *Keyhea v. Rushen* (1986) 178 Cal.App.3d 526, 530 [state prisoners have statutory right to refuse long-term treatment with psychotropic drugs absent a showing of incompetence]; *Barber v. Superior Court* (1983) 147 Cal.App.3d 1006, 1010–1011 [physicians who, at family's

19

direction, withheld life-sustaining treatment from comatose patient unlikely to recover not liable for murder]; *Foy v. Greenblott* (1983) 141 Cal.App.3d 1, 5, 11–12 [incompetent conservatee held in locked facility may still retain fundamental right to decide whether to bear a child].)

We also point out that *In re A.C.* (D.C.Ct.App. 1990) 573 A.2d 1235, on which the Does also rely, did not hold that a woman's choice of, or refusal of, obstetric care is controlling in all circumstances.  In that case, a pregnant woman with a history of cancer had a checkup when she was 25 weeks pregnant, at which point the viability of the fetus was unclear.  (*Id.* at p. 1238.)  After doctors discovered an inoperable tumor and informed the woman her illness was terminal, she was admitted to the hospital for palliative treatment designed to extend her life so her pregnancy could advance another two weeks and the baby could be delivered before she died. (*Id.* at pp. 1238–1239.)  Thereafter, she became equivocal as to whether she wanted to proceed with the pregnancy.  (*Id.* at p. 1239.)  When her condition began to deteriorate rapidly, a dispute arose about whether to immediately deliver the baby through a C-section.  (*Ibid.*)  While the woman was unconscious and believed to have only 24 hours to live, a trial court ordered that a C-section be performed to deliver the child.  (*Id.* at p. 1240.)  But then, the woman regained consciousness and stated she did not want the surgery. (*Id.* at pp. 1240–1241.)  Concluding the woman's intent was still unclear, the trial court again ordered that the woman undergo a C-section.  (*Id.* at p. 1241.)  The baby lived for only a few hours after the delivery, and the woman died of cancer two days later.  (*Ibid.*)  The principal issue before the appellate court was the legal standard applicable to the "substituted judgment" doctrine by which an incompetent patient's wishes with respect to medical care is to be determined.  (*Id.* at p. 1238.)  The court held "a court

20

must determine the patient's wishes by any means available, and must abide by those wishes unless there are truly extraordinary or compelling reasons to override them." (*Id.* at p. 1247.)

Beyond the fact that we are here addressing a medical battery claim and the issues such a claim presents—including the scope of Jane's authorization for obstetric services at the time of her admission to the hospital, whether a vacuum-assisted vaginal delivery is "substantially different" from those services, and whether there was a medical emergency necessitating a vacuum-assisted delivery—the D.C. court did not hold that a woman's belated indication that she does not want to bear the child she is carrying controls the outcome in every case. While a woman's refusal of a C-section may in most instances control, it was not, said the court, deciding "whether, or in what circumstances, the state's interests can ever prevail over the interests of a pregnant patient." (*In re A.C., supra,* 573 A.2d at p. 1252.)

Thus, the same court, in *Khiem v. United States* (D.C.Ct.App. 1992) 612 A.2d 160, 164, subsequently distinguished *In re A.C.,* describing the question it had considered in that case as "whether the uncertain prospects of saving the life of the fetus warranted compelling the patient to undergo major surgery without her consent." (*Id.* at p. 164, fn. 7.) On the "quite different" facts of *Khiem*, the D.C. court held "the government's interest in bringing to trial a case involving two alleged murders" was sufficient to outweigh the defendant's "right to refuse the closely monitored administration to him, over a comparatively short period, of psychotropic drugs." (*Ibid.*)

Here, the Does also alleged "quite different" facts—indeed significantly different facts—from those in *In re A.C.* Jane did not allege that she was subjected to C-section, which the D.C. court called "a massive intrusion into a person's body." (*In re A.C., supra,* 573 A.2d at p. 1252.) She alleged she went

21

into labor at 39 weeks (full term). She alleged she labored for nearly two days to give birth vaginally. She did not allege there was any question as to the viability of the baby. And she did not allege that she did not want to give birth. Further, she alleged the vacuum-assisted vaginal delivery was performed after an ultrasound and after she had started to develop a fever and the baby's heart rate became elevated. In sum, *In re A.C.* does not support the Does' claim that regardless of the medical authorization Jane gave on admission, and regardless of whether or not complications arose requiring immediate delivery of her baby, she had an absolute right to refuse any intervention and specifically one far less intrusive than a C-section.

We therefore conclude Jane alleged a medical battery claim against Dr. Kachru in one respect—the performance of the vacuum-assisted vaginal delivery over her express objection to that procedure.

### B. Gender Violence

Relying on their medical battery claim against Dr. Kachru, which we have concluded is limited to the vacuum-assisted vaginal delivery Kachru performed over Jane's objection, the Does maintain Jane also stated a "gender violence" claim against Kachru under Civil Code section 52.4. They reason that because "gender" is assertedly defined for purposes of that statute as including, among a number of other characteristics, "childbirth," an alleged medical battery by an obstetric provider based on a medical procedure performed during childbirth, a fortiori, also alleges a gender-violence claim actionable under this civil rights statute. We conclude otherwise and reject their assertion that discriminatory intent is not an element of a civil rights claim under Civil Code section 52.4 and that such a

22

claim follows as a matter of course—and is essentially duplicative or derivative of—a medical battery claim against an obstetric provider.

The Does cite no case that considers the applicability of Civil Code section 52.4 to circumstances even remotely similar to those at hand. Nor are we aware of any such case. We are therefore called on to examine the language of the statute and, if appropriate, its legislative history.

As has been frequently stated, " ' " ' " ' "our fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." [Citation.] "Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose." ' " ' " ' " (*Rogers v. City of Redlands* (2025) 112 Cal.App.5th 667, 673 (*Rogers*).)

***The Statutory Language***

The statute commences with several uncodified findings, one of which states: "It is the purpose of this act to protect the civil rights of victims of gender-motivated violence and thereby to promote the public safety, health, and well-being of all persons within California." (Stats. 2002, ch. 842, § 1; see *Doe v. Superior Court* (2023) 15 Cal.5th 40, 69 [" 'An uncodified section is part

23

of the statutory law.  [Citation.]  "In considering the purpose of legislation, statements of the intent of the enacting body contained in a preamble, while not conclusive, are entitled to consideration.  [Citations.]  Although such statements in an uncodified section do not confer power, determine rights, or enlarge the scope of a measure, they properly may be utilized as an aid in construing a statute." ' "].)

The statute's codified provisions state in relevant part:

"(a) Any person who has been subjected to gender violence may bring a civil action for damages against any responsible party. . . . [¶]  . . . [¶]

"(c) For purposes of this section, 'gender violence' is a form of sex discrimination and means either of the following:

"(1) One or more acts that would constitute a criminal offense under state law that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, committed at least in part based on the gender of the victim, whether or not those acts have resulted in criminal complaints, charges, prosecution, or conviction. [¶]  . . . [¶]

"(d) For purposes of this section, 'gender' has the meaning set forth in Section 51."  (Civ. Code, § 52.4, subds. (a), (c)(1), (d).)

Civil Code section 51, in turn, commonly known as the Unruh Civil Rights Act, guarantees California residents equal access to public accommodations "no matter what their sex, race, color" or other enumerated characteristics.  (Civ. Code, § 51, subds. (a) & (b).)  The Act defines "Sex" as follows: " 'Sex' includes, but is not limited to, pregnancy, childbirth, or medical conditions related to pregnancy or childbirth.  'Sex' also includes, but is not limited to, a person's gender.  'Gender' means sex, and includes a person's gender identity and gender expression.  'Gender expression' means a person's gender-related appearance and behavior whether or not

24

stereotypically associated with the person's assigned sex at birth." (*Id.*, § 51, subd. (e)(6).)

In examining the "plain language" of a statute, we read words in their ordinary and commonsense meaning. (See *Rogers, supra,* 112 Cal.App.5th at p. 673.) We also read words in the context of the statute as a whole; we do not, in other words, lift selected words out of a statute and examine them sans the statutory framework of which they are a part. (*Ibid.*; *People v. Mendoza* (2023) 88 Cal.App.5th 287, 294 [court does not " 'consider the statutory language "in isolation" ' "; " '[r]ather, we look to "the entire substance of the statute . . . in order to determine the scope and purpose of the provision. . . ." ' "; " '[t]hat is, we construe the words in question " 'in context, keeping in mind the nature and obvious purpose of the statute. . . .' " ' " (Quoting *People v. Ruiz* (2018) 4 Cal.5th 1100, 1106.)].)

The plain language of Civil Code section 52.4 speaks in terms of "discrimination" "based on" "gender" as defined in Civil Code section 51, subdivision (e)(6). Thus, by all appearances, the statute is aimed at those who perpetrate, or threaten to perpetrate, criminal violence and whose motivation to do so is based, at least in part, on the gender of the victim. The statute is not, in other words, directed at individuals who perpetrate or threaten to perpetrate violence simply for the sake of engaging in violence or as a mindless and random act—such violence, even if perpetrated against a victim who comes within any of the classes of persons described in the Unruh Act's definition of gender, is not "based on" the victim's gender under Civil Code section 52.4. In other words, simply because a victim of violence happens to be an individual whose attributes come within the definitional provisions of Civil Code section 51, subdivision (e)(6), does not, in and of itself, suffice to state a civil rights claim for gender violence. It certainly

25

seems to follow, then, that an alleged act of medical violence against a patient who happens to come within the definitional provisions of the Unruh Act is not, alone, sufficient to state a gender-violence claim under Civil Code section 52.4.

The Does urge us to conclude otherwise reasoning that Dr. Kachru's alleged medical battery occurred while Jane was in "childbirth." Because "childbirth" is a protected characteristic under the Unruh Act's definition of "Sex" and thus assertedly comes within that Act's imbedded definition of "Gender," the Does maintain the medical battery allegedly perpetrated by Kachru was thus "based on" Jane's gender and therefore actionable gender violence under Civil Code section 52.4. Thus, according to the Does' reading of the statute, whether Kachru was motivated by any discriminatory intent is irrelevant. We do not see it that way.

To begin with, we strongly doubt the definition of "Gender" imbedded in Civil Code section 51, subdivision (e)(6) includes such transitory conditions as "pregnancy, childbirth, or medical conditions related to pregnancy or childbirth," as the Does have assumed.

The first two sentences of Civil Code section 51, subdivision (e)(6) define "Sex." The first of these states: " 'Sex' includes, but is not limited to, pregnancy, childbirth, or medical conditions related to pregnancy or childbirth." (Civ. Code, § 51, subd. (e)(6).) The second states: " 'Sex' also includes, but is not limited to, a person's gender." (*Ibid*.) Thus, the definition of "Sex" *separately* includes "pregnancy, childbirth, or medical conditions related" thereto, and "gender." (*Ibid*.) Or stated another way, the definitional language pertaining to "Sex" expressly treats "gender" as something *different* than "pregnancy, childbirth, or medical conditions related" thereto.

The next two sentences of Civil Code section 51, subdivision (e)(6) define "Gender." The first of these states: " 'Gender' means sex, and includes a person's gender identity and gender expression." (Civ. Code, § 51, subd. (e)(6).) The second states: " 'Gender expression' means a person's gender-related appearance and behavior whether or not stereotypically associated with the person's assigned sex at birth." (*Ibid*.) The Does read the phrase " 'Gender' means sex" in the first sentence of the definition of "gender" as sweeping the *entirety* of the preceding definitional provisions pertaining to "Sex" into the definition of "Gender."

It makes no sense, however, for the definition of "Sex" to *separately* include "gender" if the reference to "sex" in the definition of "gender" means "gender" embraces the *entirety* of the immediately preceding definitional provisions pertaining to "Sex." Indeed, the Does' reading effectively obliterates the explicit distinction made in the definitional language of "Sex" between "pregnancy, childbirth, or medical conditions related" thereto, and "gender." Furthermore, both sentences defining the term "Sex" include the phrase "includes, but is not limited to," a phrase "of enlargement" meaning the specific examples that follow are illustrative, not exhaustive. (See *People v. Arias* (2008) 45 Cal.4th 169, 181 ["[T]he proviso 'including, but not limited to' 'connotes an illustrative listing, one purposefully capable of enlargement.' "].) The inclusion of "pregnancy" and "childbirth" are therefore illustrative examples of characteristics that may bring persons within the definition of "Sex." The same is true of that definition's separate inclusion of "gender"—it is a different, and distinct, illustrative example of another characteristic that may bring a person within the definition of "Sex."

No such language of enlargement is included in the imbedded definition of "gender." Rather, the definitional language pertaining to "gender" is

27

focused and fixed, and states: " 'Gender' means sex, and includes a person's gender identity and gender expression. 'Gender expression' means a person's gender-related appearance and behavior whether or not stereotypically associated with the person's assigned sex at birth." (Civ. Code, § 51, subd. (e)(6).) These definitional provisions thus *further* define the term "gender" as used in the definitional language pertaining to "Sex"—not the other way around.

Accordingly, in our view, the only reasonable reading of the phrase " 'Gender' means sex" (Civ. Code, § 51, subd. (e)(6)) is that "sex" refers to being male or female, or nonbinary. Indeed, this is the only reading consistent with both commonly understood and emerging meanings of "gender." (See, e.g., *In re Marriage Cases* (2008) 43 Cal.4th 757, 833 [term "gender" used in reference to person being male or female];[6] *Sandoval v. Pali Institute, Inc.* (2025) 113 Cal.App.5th 616, 627 [" 'With stunning speed, nonbinary gender identities have gone from obscurity to prominence in American public life.' " (Quoting Clarke, *They, Them, and Theirs* (2019) 132 Harv. L.Rev. 894, 896.)]; *Taking Offense v. State of California* (2021) 66 Cal.App.5th 696, 722–726 (*Taking Offense*), review granted Nov. 10, 2021, S270535 [term "gender" used in reference to "person's assigned sex at birth" or "gender identity" as male or female]; *Woods v. Horton* (2008) 167 Cal.App.4th 658, 674 [term "gender" used in reference to person being male or female]; *Catchpole v. Brannon* (1995) 36 Cal.App.4th 237, 245, fn. 2 (*Catchpole*)[7] [using definition of "gender bias" developed by the Judicial

---

[6] Superseded by constitutional amendment on other grounds as stated in *Hollingsworth v. Perry* (2013) 570 U.S. 693, 701.

[7] Disapproved on another ground by *People v. Freeman* (2010) 47 Cal.4th 993, 1006, footnote 4.

28

Council Advisory Committee on Gender Bias in the Courts, which provides that " 'gender bias includes behavior or decision making of participants in the justice system which is based on or reveals (1) stereotypical attitudes about the nature and roles of women and men; (2) cultural perceptions of their relative worth; and (3) myths and misconceptions about the social and economic realities encountered by both sexes.' " (Quoting Judicial Council of Cal. Achieving Equal Justice for Women and Men in the Courts: The Draft Rep. of the Judicial Council Advisory Committee on Gender Bias in the Courts (1990) at p. 2.)].)

This reading is further bolstered by the remainder of the definitional language pertaining to "gender"—that gender "includes a person's gender identity or gender expression" and " 'Gender expression' means a person's gender-related appearance and behavior whether or not stereotypically associated with the person's assigned sex at birth." (Civ. Code, § 51, subd. (e)(6).) The grounding reference of these provisions is sex in its most fundamental sense, i.e., a person's being, or identifying or expressing oneself as, male, female, or nonbinary. (See *Taking Offense, supra,* 66 Cal.App.5th at p. 725 [holding transgender persons and nontransgender persons similarly situated in assessing equal protection challenge to long-term care facility statute and stating "transgender residents possess a characteristic that nontransgender residents do not, namely, a biological sex at birth that differs from their expressed gender identity."].)

But even assuming, as do the Does, that "gender" includes the transitory state of "childbirth," the language of Civil Code section 52.4 does not, in our view, support their claim that having alleged a medical battery claim based on Dr. Kachru performing a vacuum-assisted vaginal delivery over Jane's objection, they have necessarily also alleged a gender-violence

29

civil rights claim.  In other words, we do not agree with the Does that under Civil Code section 52.4 the absence of any discriminatory intent is irrelevant.

As we have recited, the statute commences with an uncodified finding that "It is the purpose of this act to protect the *civil rights* of victims of gender-*motivated* violence and thereby to promote the public safety, health, and well-being of all persons within California."  (Stats. 2002, ch. 842, § 1, italics added.)  The statute also expressly states that " 'gender violence' is a form of sex *discrimination*."  (Civ. Code, § 52.4, subd. (c), italics added.)  Language such as "gender-motivated" and "discrimination" connote a volitional decision to choose one person rather than another, or to inflict injury on a person, because of bias or animus towards that person arising from a legally protected characteristic of that person.[8]

In discerning the Legislature's intent from the language it employed, we are guided by the then-existing state of the law, including decisional law by our courts.  (See *People v. Terwilligar* (2025) 109 Cal.App.5th 585, 596 [" 'We presume that when enacting a statute, the Legislature was aware of existing laws and judicial decisions in effect at the time and intended to maintain a consistent body of rules.' "  (Quoting *Kalpoe v. Superior Court* (2013) 222 Cal.App.4th 206, 211.)].)

In the instant case, we find our Supreme Court's opinion in *In re M.S.* (1995) 10 Cal.4th 698, of particular assistance.  In that case, the high court

---

[8] We use the phrase "bias or animus" as reflective of the *range* of discriminatory intent contemplated by our civil rights statutes, which need not be hate but can arise from uninformed or unfair assumptions about a person because he, she, or they have a protected characteristic or status.  (See *Isbister v. Boys' Club of Santa Cruz, Inc.* (1985) 40 Cal.3d 72, 87 [speaking in terms of "stereotyped notions" about sex and gender]; *Catchpole, supra,* 36 Cal.App.4th at p. 245 [speaking in terms of " 'preconceptions about the parties because of their gender' "].)

addressed the meaning of the phrase "because of" as used in several state "hate crimes" statutes and specifically addressed the extent to which discriminatory motivation must trigger prohibited violence. (*Id.* at p. 716.) The court first observed " '[b]ecause of' is a term of common usage. It connotes a causal link between the victim's characteristic and the offender's conduct, and resembles language found in other civil rights and anti-discrimination statutes.' " (*Id.* at p. 717.) It went on to explain,

> "The statutes require proof, inter alia, that the offense was committed because of the perpetrator's racial, religious or other specified bias. As used in [Penal Code] sections 422.6 and 422.7, and as a matter of common usage, 'because of' means the conduct must have been caused by the prohibited bias. A cause is a condition that logically must exist for a given result or consequence to occur. (American Heritage Dict. (2d ed. 1982) p. 249.)

> "One can articulate, then, the parameters of the expressed bias [Penal Code] sections 422.6 and 422.7 target. On one hand, the Legislature has not sought to punish offenses committed by a person who entertains in some degree racial, religious or other bias, but whose bias is not what motivated the offense; in that situation, it cannot be said the offense was committed *because of* the bias. On the other hand, nothing in the text of the statute suggests the Legislature intended to limit punishment to offenses committed exclusively or even mainly because of the prohibited bias. A number of causes may operate concurrently to produce a given result, none necessarily predominating over the others. By employing the phrase 'because of' in sections 422.6 and 422.7, the Legislature has simply dictated *the bias motivation* must be a cause in fact of the offense, whether or not other causes also exist." (*In re M.S., supra,* 10 Cal.4th at p. 719, italics & fn. omitted, second italics added.)

Thus, the court rejected the appellant's argument that the phrase "because of" in the state hate crimes statute did not provide "adequate notice of the nature of the prohibited *motive*." (*In re M.S., supra,* 10 Cal.4th at p. 716, italics added.) In doing so, the court cited to a number of "other" civil

31

rights and anti-discrimination statutes which variously used not only that same phrase, "because of," but also "on account of" and "by reason of." (*Id.* at p. 717, italics omitted.) The court "found no authority holding any of these similar formulations unconstitutionally vague." (*Ibid.*) Rather, the conduct prohibited by these statutes "is objectively clear, and its *discriminatory motivation* is an element that must be proved beyond a reasonable doubt." (*Id.* at p. 718, italics added.)

Given that Civil Code section 52.4 is predicated on a legislative finding of intent "to protect the *civil rights* of victims of gender-*motivated* violence and thereby to promote the public safety, health, and well-being of all persons within California" (Stats. 2002, ch. 842, § 1, italics added) and expressly states gender-violence is a form of sex *discrimination* (Civ. Code, § 52.4, subd. (c)), we conclude the phrase "based on" used in Civil Code section 52.4 is another "similar formulation" of a discriminatory motivational requirement. And that is where Jane's allegations fall short. There is no allegation that Dr. Kachru performed a vacuum-assisted vaginal delivery because she was motivated, in some part, by bias or animus against Jane because of Jane's status as a woman in childbirth.

At the very least, our conclusion that some discriminatory motivation is a requisite element of a civil rights claim under Civil Code section 52.4 is a "plausible" reading of the statute warranting an examination of the legislative history, to which we now turn. (See *City of Los Angeles v. County of Kern* (2014) 59 Cal.4th 618, 628.)

### *The Legislative History*

In our view, the legislative history of Civil Code section 52.4 confirms what seems plain from the statutory language—that it is a *civil rights* statute directed at those who perpetrate or threaten violence and are *motivated* to do

so by some *discriminatory* bias or animus based on the victim's gender as the term is defined in Civil Code section 51, subdivision (e)(6).

Civil Code section 52.4 was enacted in 2002 following the United States Supreme Court's decision in *United States v. Morrison* (2000) 529 U.S. 598 (*Morrison*), wherein the court invalidated a federal gender violence statute on the ground it exceeded Congress' legislative authority.[9] (E.g., Assem. Com. on Judiciary, Rep. on Assem. Bill No. 1928 (2001–2002 Reg. Sess.) as amended Apr. 4, 2002, pp. 1, 3; Sen. Judiciary Com., Rep. on Assem. Bill No. 1928 (2001–2002 Reg. Sess.) as amended Apr. 15, 2002, pp. 1–2.)

As the proposed legislation moved through the Assembly and Senate, committee reports consistently described it as aimed at preventing "gender-*motivated* violence." (E.g., Assem. Com. on Judiciary, Rep. on Assem. Bill No. 1928 (2001–2002 Reg. Sess.) as amended Apr. 4, 2002, p. 3, italics added; *id.,* at p. 4 [legislation "is a strong statement that California will not tolerate gender-*motivated* violence of any kind" (italics added)]; Sen. Judiciary Com., Rep. on Assem. Bill No. 1928 (2001–2002 Reg. Sess.) as amended Apr. 15, 2002, p. 2 ["bill would make certain legislative findings, including . . . that the purpose of this act is to protect the *civil rights* of victims of gender-*motivated* violence" (underscoring omitted & italics added)]; Sen. Judiciary Com., Rep.

---

[9] The high court's holding in *Morrison* was two-fold. First, it concluded Congress had exceeded its authority under the Commerce Clause. (*Morrison, supra,* 529 U.S. at pp. 607–619.) Second, as the high court had held in earlier civil rights cases, it reiterated that while Congress has the power under the Fourteenth Amendment to prohibit discriminatory acts by the government, it does not have the power to prohibit discriminatory acts solely by private persons. (*Morrison,* at pp. 619–627.) Rather, prohibitions against private discriminatory conduct must be enacted by the states, which the states have done through anti-discrimination statutes such as Civil Code section 52.4 and the Unruh Act. (See generally *Brennon B. v. Superior Court* (2022) 13 Cal.5th 662, 675–676.)

on Assem. Bill No. 1928 (2001–2002 Reg. Sess.) as amended June 21, 2002, p. 5 [bill seeks to "educate lawmakers and the public about the gender *bias* underlying sexual and domestic assaults on women" and "proposes a *civil rights* action for acts of violence *motivated* 'at least in part' by gender" (italics added)]; Sen. Judiciary Com., Rep. on Assem. Bill No. 1928 (2001–2002 Reg. Sess.) as amended June 24, 2002, p. 7 [proposed legislation is meant to "expand upon the Ralph [Civil Rights] Act [(Civ. Code, § 51.7)] in gender-related cases by allowing a cause of action to be brought for an act of violence *motivated* 'at least in part' by gender," the "theory" being "more *civil rights* suits based on sexual or domestic violence might be brought if the law required gender *bias* as merely one of the *motivating* factors for the prohibited act, not the sole or predominant factor" (italics added)].)

The statements in support of the legislation likewise described it as a *civil rights* measure aimed at violence *motivated* by *discriminatory bias*. The Assembly Judiciary Report, for example, summarized the author's argument in support of the legislation as follows:

"A woman is raped every 46 seconds in the United States. Approximately two million women are sexually assaulted each year. . . . [U]p to four million women experience serious assault by an intimate partner each year and nearly one-third of adult women report having been assaulted by a partner. . . . In addition to the devastating effects on the victims, the current epidemic of violence against women is costly to society. . . . AB 1928 would help to address the widespread problem of gender-*motivated* violence by enabling victims to hold their attackers financially responsible for their crimes." (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 1928 (2001–2002 Reg. Sess.) as amended Apr. 4, 2002, at p. 8, italics added; see Governor's Off. of Planning & Research, Enrolled Bill Rep. on Assem. Bill No. 1928 (2001–2002 Reg. Sess.) Sept. 10, 2002, p. 1 [reciting, as the purpose of bill, the author's statement that " 'Violence against women has reached epidemic proportions in this country. Women share the common experience of knowing the fear of walking alone on the street at night—the statistics shared during our hearings are startling . . . I introduced this measure

34

to ensure that women in California have *civil rights* protections that recognize and address the prevalence and enormous costs associated with attacks *based on* the gender of the victim'" (italics added)].)

The Senate Rules Committee Report included a like argument in support, stating:

> "The epidemic of violence against women in our society is massive, as are the costs associated with this violence. It is estimated that we spend $5–10 billion a year on health care, criminal justice and other social costs of domestic violence. At least one study indicates that 50% of women who have been sexually assaulted lost the job they had at the time of the assault due to issues related to the assault. In a country where as many as 6 million women are victims of domestic violence each year and as many as 1.9 million women are sexually assaulted each year, we must continue to take steps to send the message that there is no place in our society for this criminal behavior.

> "This bill will provide *women and men* who have been the victims of gender-*motivated* violence with a powerful tool that will enable them to hold their attackers financially responsible for their crimes." (Sen. Rules Com., Rep. on Assem. Bill No. 1928 (2001–2002 Reg. Sess.) as amended June 29, 2002, p. 4, italics added.)

Jane's medical battery allegations as to Dr. Kachru simply do not align with this legislative history. To recap, Jane alleged that following an ultrasound and vaginal examination, Kachru told her the baby needed to be delivered by C-section "now," Jane objected to a C-section, Kachru told her the only alternative was a vacuum-assisted vaginal delivery, Jane also objected to that procedure, but Kachru nevertheless performed it. While the Does plainly disagree with Kachru's assessment of the situation and opinion Jane's baby needed to be delivered immediately, this is not a scenario remotely like those described in the legislative history. There is, in short, no allegation that Kachru performed a vacuum-assisted vaginal delivery

35

because she was *motivated* by *discriminatory bias or animus* against Jane because Jane was giving birth to a child.

The legislative history also reflects that subdivision (c)(1) of Civil Code section 52.4—which provides the operative definition of "gender violence" applicable here and states in pertinent part that gender violence means "[o]ne or more acts that would constitute a criminal offense" involving "physical force against" the person "committed at least in part based on the gender of the victim"—was twice amended during the legislative process.

As introduced, the relevant language defined gender violence as, "One or more acts of violence or physical aggression committed at least in part on the basis of sex, gender, or sexuality, whether or not those acts have resulted in criminal complaints, charges, prosecution, or conviction." (Assem. Bill No. 1928 (2001–2002 Reg. Sess.) as introduced Feb. 12, 2002.) This tracked, but only in part, the definitional provision of the invalidated federal statute which "required that the [violent] act be committed because of gender or on the basis of gender, and due at least in part to an animus based on the victim's gender." (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 1928 (2001–2002 Reg. Sess.) as amended Apr. 4, 2002, p. 6.) The proposed state legislation was described as "far broader" in that it extended not only to acts motivated by the victim's gender, but also to "any act in any part motivated by the *sex . . .* or *sexuality* of the victim." (*Id.*, at pp. 5–6, italics added.) And, unlike the federal statute, the proposed state legislation did not require that the prohibited conduct be criminal conduct. (*Id.* at p. 6.) The committee report suggested the author might consider revising the proposed definitional language to more closely track that of the invalidated federal statute. (*Ibid.*)

Thus, the first amendment to the pertinent language—which modified the definition of gender violence to state, "One or more acts that would

36

constitute a criminal offense under state law that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, committed at least in part on an animus based on the victim's sex, gender, or sexuality, whether or not those acts have resulted in criminal complaints, charges, prosecution, or conviction." (Assem. Bill No. 1928 (2001–2002 Reg. Sess.) as amended Apr. 15, 2002.) This new proposed language, which added the criminal conduct requirement that had been in the invalidated federal legislation and borrowed that legislation's "animus" terminology, received extensive discussion in the subsequently prepared Senate Judiciary Committee Report. (Sen. Judiciary Com., Rep. on Assem. Bill No. 1928 (2001–2002 Reg. Sess.) as amended Apr. 15, 2002, pp. 6–10.)

Among other things, the committee report stated there had been considerable debate in Congress over the scope of the federal legislation, and its proponents had ultimately taken the position that determining whether some degree of "gender *motivation*" underlay violence or threats of violence would be based on "the 'totality of the circumstances' surrounding the act (e.g., statements by the defendant that he is targeting women, use of epithets derogatory to women, or a history of attacks on women)." (Sen. Judiciary Com., Rep. on Assem. Bill No. 1928 (2001–2002 Reg. Sess.) as amended Apr. 15, 2002, at p. 7, italics added.) "Proponents noted that such factors are commonly used to determine racial or religious bias in hate crime prosecutions, and should be easily adapted to cases of gender *bias*." (*Ibid.,* italics added.) The legislative history of the federal legislation also indicated "that 'animus' based on gender was not limited to hostility, but was meant to include any circumstance in which the victim's gender was a *motivating*

37

factor in the attack."[10] (*Ibid.*, italics added.) Further, the federal legislation "did not require gender animus to be the 'only' or the 'predominant' motivation, but merely 'one of' the *motivations* for the assault." (*Ibid.*, italics added.)

The Senate Judiciary Committee Report went on to say the " 'hate crime' " model, referenced by the proponents of the federal legislation and which uses a "case-by-case analysis," could "provide a useful model for a different approach," namely making gender violence "a tort" (in addition to the requisite crime that was committed) as the legislation proposed. (Sen. Judiciary Com., Rep. on Assem. Bill No. 1928 (2001–2002 Reg. Sess.) as amended Apr. 15, 2002, p. 9.) The report further observed the term " 'motivation' " "does not require proof of hostility," although most hate crime prosecutions "occur in cases involving hostility." (*Ibid.*)

The committee report ultimately suggested that the proposed legislation be styled as a "tort for violence *motivated* by gender" and also expanded to embrace violence motivated by other characteristics including race, color, religion, ancestry, national origin, disability, and sexual orientation (Sen. Judiciary Com., Rep. on Assem. Bill No. 1928 (2001–2002 Reg. Sess.) as amended Apr. 15, 2002, at p. 10, italics added), as an adjunct to "a parallel hate crimes statute." (*Ibid.*) "Aligning a tort for violence *motivated* by gender (as well as by other characteristics) with a parallel hate crimes statute would facilitate the use of the case-by-case *bias* analysis successfully applied in hate crime prosecutions." (*Ibid.*, italics added.) "With its focus redirected in this fashion, the bill could direct many domestic and

---

[10] In other words, "animus" did *not* carry connotations of hate, fear, or other "dark" meaning, but was essentially employed as a synonym for "motivated" behavior.

sexual violence victims to specific torts that better suit their cases" and "accommodate those plaintiffs who have a clear factual basis to prove gender-based violence, and allow the many victims of other acts of *discrimination*-based violence to seek enhanced civil remedies as well." (*Ibid.,* italics added.) The report proposed deleting the term " 'animus' " as "susceptible to too broad a definition," replacing " 'at least in part on' " with " 'because of' " to "align the tort" with the language of the hate crimes statutes, deleting " 'sex' " as duplicative of "gender," and deleting " 'sexuality' " as "ambiguous." (*Id.*, at p. 11.)

The pertinent language was amended once more to read as it currently does, defining gender violence as, "One or more acts that would constitute a criminal offense under state law that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, committed at least in part based on the gender of the victim, whether or not those acts have resulted in criminal complaints, charges, prosecution, or conviction." (Assem. Bill No. 1928 (2001–2002 Reg. Sess.) as amended June 24, 2002.) This version, thus, again made some of the changes suggested by the Senate Judiciary Committee Report. The terms "sex" and "sexuality" were removed, and the legislation was not expanded into a comprehensive discriminatory violence measure. Thus, it became limited to gender violence, bringing its scope into line with the invalidated federal statute. It therefore, as the report had alternatively suggested, "propose[d] a distinct gender violence tort." (Sen. Judiciary Com., Rep. on Assem. Bill No. 1928 (2001–2002 Reg. Sess.) as amended Apr. 15, 2002, at p. 10.) The term "animus" was also removed. But instead of using the Penal Code language, the phrase "at least in part" remained in the legislation, now joined with the phrase "based on."

The Senate Judiciary Committee Report prepared for this version of the legislation focused to a considerable degree on concerns previously expressed that the proposed legislation largely duplicated existing state anti-discrimination laws.[11] (E.g., Sen. Judiciary Com., Rep. on Assem. Bill No. 1928 (2001–2002 Reg. Sess.) as amended June 24, 2002, p. 5.) As to the pertinent definitional language, the committee report stated the author viewed it as "expand[ing] upon the Ralph Act in gender-related cases by allowing a cause of action to be brought for an act of violence *motivated* 'at least in part' by gender," the theory being more "sexual or domestic violence cases might be brought if the law required proof of gender *bias* as merely one of the motivating factors for the prohibited act, not the sole or predominant factor."[12] (Sen. Judiciary Com., Rep. on Assem. Bill No. 1928, *supra*, as amended June 24, 2002, at p. 7, italics added.)

_____

[11] These laws included: civil actions for assault and battery, including acts of sexual abuse and domestic violence; civil actions for sexual battery and stalking; the Ralph Civil Rights Act (Civ. Code, § 51.7; Ralph Act) prohibiting any act of violence or intimidation or threat of such committed against a person "because of the person's race, color, religion, ancestry, national origin, political affiliation, sex, sexual orientation, age, disability, or position in a labor dispute, or because another person perceives them to have one or more of those characteristics"; and Civil Code sections 51.7 and 51.9, allowing state and local prosecutors to bring civil rights claims. (Sen. Judiciary Com., Rep. on Assem. Bill No. 1928 (2001–2002 Reg. Sess.) as amended June 24, 2002, at pp. 2–3.)

[12] "[V]iolations of the Ralph Civil Rights Act cannot be accidental, as liability requires a showing that the defendant deliberately acted with 'a prohibited discriminatory motive.' " (*General Insurance Company of America v. Hall* (C.D.Cal. 2023) 657 F.Supp.3d 1302, 1308, quoting *Gabrielle A. v. County of Orange* (2017) 10 Cal.App.5th 1268, 1291; see *Estate of Nunis v. City of Chula Vista* (S.D.Cal. 2023) 676 F.Supp.3d 867, 886 [plaintiffs could not prevail on Ralph Act claim where "record [was] devoid of any race-related comments or other evidence from which a reasonable juror could conclude

The committee report then observed that the Ralph Act, which prohibits violent acts "because of" the victim's sex, race, or other enumerated characteristic, does not require any of its specified *biases* to be the sole or predominant factor *motivating* any prohibited act of violence. (Sen. Judiciary Com., Rep. on Assem. Bill No. 1928 (2001–2002 Reg. Sess.) as amended June 24, 2002, p. 7.)

The report also discussed our Supreme Court's holding in *In re M.S., supra,* 10 Cal.4th 698, which addressed the extent to which discriminatory motivation must trigger the violence prohibited by our state's hate crime laws. As we have discussed, the court concluded use of the phrase "because of" provided "adequate notice of the nature of the prohibited *motive.*" (*Id.* at p. 716, italics added.) Such phraseology "dictated that the *bias motivation* must be a cause in fact of the offense, whether or not other causes exist" and "[w]hen multiple concurrent motives exist, the *prohibited bias* must be a substantial factor in bringing about the crime." (*Id.* at p. 719, italics added.)

The report went on to observe that in light of *In re M.S.* the state's civil rights laws "already appear to provide for a cause of action for violence

_____

that race was a motivating factor in Defendants' conduct"]; *Black Lives Matter-Stockton Chapter v. San Joaquin County Sheriff's Office* (E.D.Cal. 2019) 398 F.Supp.3d 660, 678–679 ["The elements of a Ralph Act claim for threatened violence under California law are: (1) The defendant intentionally threatened violence against the plaintiff or her property, whether or not defendant actually intended to carry out the threat; (2) A substantial motivating reason for the defendant's conduct was her perception of the plaintiff's protected characteristic as defined by the statute (including race and political affiliation); (3) A reasonable person in plaintiff's position would have believed that defendant would carry out the threat; (4) A reasonable person in plaintiff's position would have been intimidated by defendant's conduct; (5) Plaintiff was harmed; and (6) Defendant's conduct was a substantial factor in causing the plaintiff's harm." (Citing Judicial Council of California Civil Jury Instruction 3064 (2019).)].)

*motivated* 'at least in part' by gender." (Sen. Judiciary Com., Rep. on Assem. Bill No. 1928 (2001–2002 Reg. Sess.) as amended June 24, 2002, p. 8, italics added.) It added that "[t]o the extent the bill would propose a cause of action when gender *bias* is a less-than-substantial motivating factor, the *In re M.S.* analysis appears to imply that such circumstances would provide an insufficient causal nexus to the act to allow for recovery." (*Ibid.*, italics added.) The report therefore suggested, among other things, the author might consider amending the Ralph Act in lieu of moving forward with the proposed legislation. (*Ibid.*) Alternatively, it suggested the pertinent definitional language could be "clarify[ied]" by amending it to read "where *bias* toward the victim's gender was a substantial factor motivating that act," commenting such language would better reflect "the state of the law as set forth by the Supreme Court in *In re M.S.*" (*Id.*, at pp. 9–11, italics added.)

While no further changes were made to the pertinent definitional language, subsequent reports continued to describe the legislation as "modeled after" the invalidated federal statute and prohibiting "gender-*motivated*" violence or threats of violence. (E.g., Conc. in Sen. Amend., Assem. Bill No. 1928 (2001–2002 Reg. Sess.) as amended June 29, 2002, p. 3, italics added.) Although these reports also continued to point out the legislation was significantly duplicative of existing statutes such as the Ralph Act, they posited three justifications for enacting the legislation: "[I]t offers a clear statement of the state's intent to provide broad and comprehensive relief to the victims of gender violence." It "provides a three year statute of limitations" for acts "which might otherwise fall under a one year statute." And it provides for the recovery of attorney fees, "a remedy not available in most tort actions." (*Ibid.*) In short, as does the earlier legislative history, these later reports reinforce that Civil Code section 52.4 is directed at

persons who perpetrate, or threatened to perpetrate, criminal violence and who are *motivated* to do so by *discriminatory* bias or animus based on the victim's gender.

As enacted, Civil Code section 52.4 defined "gender violence," but did not define the term "gender."  More than a decade later, the Legislature did so by amending the statute to add subdivision (d), which states "for purposes of this section, 'gender' has the meaning set forth in Section 51."  (Stats. 2015, ch. 202, § 1.)  As we have recited, Civil Code section 51, subdivision (e)(6) defines the term "Sex" for purposes of the Unruh Act.  That definition expressly includes "gender," separately and distinct from other characteristics, and also further defines "gender."

The legislative history of this amendment to Civil Code section 52.4 echoes that of the original legislation.  For example, the Assembly Committee on Judiciary Report included the following statement by the author: "Although the lesbian, gay and bisexual community has made tremendous progress in civil rights protections, violence *motivated by* a person's sexual orientation remains a serious problem.  The problem is particularly acute for transgender individuals, who continue to face *discrimination*, violence and even death."  (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 830 (2015–2016 Reg. Sess.) as introduced Feb. 26, 2015, p. 3, italics added.)

The report also included a statement by the National Center for Lesbian Rights, a proponent of the amendment, stating:

> "Approximately 1 in 8 lesbian women and nearly half of bisexual women experience rape in their lifetime, and statistics likely increase when a broader definition of sexual assault is used.  Nearly half of bisexual men and four in ten gay men have experienced sexual violence other than rape in their lifetime. . . .  As with most *hate-based* violence, transgender individuals are the most likely to be affected in the LGBT community.  A staggering 64% of transgender people have experienced sexual assault in their lifetime.

43

"Though the Violence Against Women Act of 2013 (VAWA) recently extended LGBT nondiscrimination protections in resources for domestic and sexual violence, service providers across the country still lack the cultural competency needed to serve the LGBT community. . . LGBT people must also face the specter of *hate violence* in the form of sexual assault." (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 830 (2015–2016 Reg. Sess.) as introduced Feb. 26, 2015, p. 4, italics added; see *ibid.* [statement by the Conference of California Bar Associations, a sponsor of the bill, that the " 'level of violence *targeting* transgender people, particularly transgender women of color, is a national crisis. . . .' [¶] . . . [The proposed amendment] will clarify that the act's provisions and remedies extend to transgender victims of gender-*motivated* violence" (italics added)]; Sen. Com. on Judiciary, Assem. Bill No. 830 (2015–2016 Reg. Sess.) as amended May 7, 2015, p. 5 ["According to the author: [¶] Civil Code [section] 52.4 [as enacted] . . . defines gender violence for this purpose as a crime of violence *motivated by* the gender of the victim. . . ." (Italics added.)]; *id.*, p. 9 [referencing "other anti-*discrimination*" and "anti-*hate crime* civil rights based statutes" (italics added)]; *ibid.* [Equality California, another proponent of the legislation, "not[ed] that by conforming the definition of gender to Unruh, this bill 'will make clear that Civil Code [section] 52.4's provisions and remedies extend to transgender victims of *bias-motivated* violence' as well as to victims of violence that was based upon their sexual orientation" (italics added)]; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 830 (2015–2016 Reg. Sess.) as amended June 23, 2015, p. 5 ["Generally, [Civil Code] [s]ection 52.4 permits a person injured by a crime of violence *motivated* by gender to bring a civil action for various types of relief. . . ." (Italics added.)]; *id.*, p. 7 [amendment "will clarify that the act's provisions and remedies extend to transgender victims of gender-*motivated* violence" (italics added)].)

In sum, we do not see how the legislative history of Civil Code section 52.4 could be any clearer that the statute is directed at persons who perpetrate or threaten to perpetrate criminal violence and who are *motivated* to do so by gender *bias or animus*—in other words, persons who are motivated, at least to some degree, by *discriminatory* intent.

The medical battery allegations against Dr. Krachu do not allege any such intent. Just as a person who perpetrates or threatens criminal violence simply for the sake of violence cannot be said to have been *motivated* by any *discriminatory* gender *bias or animus*, so too, the fact Kachru allegedly performed an unauthorized medical procedure during childbirth, in and of itself, cannot be said to have been *motivated* by any *discriminatory* gender-*bias or animus.*

Finally, even if the "plain language" of Civil Code section 52.4 and its incorporated definition of "gender" provided by the Unruh Act arguably reads as the Does posit—that because the alleged medical battery by Dr. Kachru was a procedure performed during childbirth, it was therefore "based on" Jane's protected "childbirth" status and thus constitutes actionable gender "discrimination"—which we do not think it does, such a reading cannot be reconciled with the Legislature's intent so plainly revealed by the legislative history. Courts are not a slave to the plain meaning rule and " 'should not give language of a statute its literal meaning if doing so would result in absurd consequences unintended by the Legislature. [Citation.] In that case, the intent of the law prevails over the letter, and the letter, if possible, will be read so as to conform to the spirit of the act.' " (*James v. State of California* (2014) 229 Cal.App.4th 130, 138–139, quoting *In re David S.* (2005) 133 Cal.App.4th 1160, 1164.)

In short, we cannot endorse a reading of Civil Code section 52.4 that, when applied to an obstetric provider, eliminates from this civil rights statute any requirement that the defendant have been motivated, at least in part, by *discriminatory* bias or animus based on the victim's gender. Or stated another way, we cannot endorse an interpretation that renders obstetric providers automatically subject to a civil rights claim under Civil Code

45

section 52.4 if they are sued for medical battery for performing a procedure that allegedly exceeded the scope of the patient's authorization for obstetric care during "childbirth" (and under the same reasoning, during "pregnancy" or in connection with any "medical conditions related to pregnancy or childbirth"). (Civ. Code, § 51, subd. (e)(6).) In fact, under the Does' reasoning, any medical provider who allegedly commits a medical battery by performing an allegedly unauthorized sex or gender-specific (or biologically appropriate) procedure (such as removing the "wrong" ovary in connection with treating ovarian cancer, or removing the "wrong" testicle in connection with treating testicular cancer) would, ipso facto, also be subject to a claim for gender violence under Civil Code section 52.4 because such sex or gender-specific (or biologically appropriate) procedures would, according to the Does, be "based on" the patient's "sex" or "gender."

The dissent asserts we are overstating the ramifications of adopting the Does' reasoning. But as far as we can discern, the dissent draws no distinction between a medical battery claim based on an allegedly unauthorized sex or gender-specific (or biologically appropriate) procedure and a gender violence civil rights claim under Civil Code section 52.4—if the former is adequately alleged, so too, according to the dissent, is the latter.

Rather, the dissent observes medical providers have defenses to a medical battery claim—that the treatment given, or procedure performed, was not "substantially different" than that for which informed consent was given or that the provider acted in the face of a medical emergency. (See *Conte, supra,* 107 Cal.App.4th at p. 1268 [medical provider may act beyond patient's authorization in "life-or health-threatening situations"]; see CACI No. 554 ["Affirmative Defense—Emergency"].) However, that a provider may have a defense does not alter the fact that under the Does,' and the dissent's,

46

reasoning, any medical battery claim based on an allegedly unauthorized sex or gender-specific (or biologically appropriate) procedure will suffice to also allege a gender violence civil rights claim under Civil Code sections 52.4 and 51, subdivision (e)(6), without regard to whether the provider acted with any discriminatory intent.

In sum, the dissent's reading of the statute—that Civil Code "[s]ection 52.4 provides a civil remedy for criminal *obstetric battery*"—goes too far.  (Dis. opn. *post*, at p. 1, italics added.)  It discards the statute's requirement to show a gender-based motivation by transforming any medical battery that occurs during childbirth (or any of the other contexts enumerated in Civil Code section 51, subdivision (e)(6)) into gender violence.  In this way, the dissent conflates the *occasion* during which the alleged battery arises (i.e., childbirth) with a medical provider's gender-based *motivation* for committing the alleged battery.

We have no quarrel with the proposition that an obstetric provider (or any other provider of sex or gender-specific (or biologically appropriate treatment)) can commit gender violence actionable under Civil Code section 52.4.  But we are persuaded by both the plain language of the statute and its legislative history that such a claim requires proof not only that the provider committed medical battery but also that the provider was motivated to do so, at least in part, by discriminatory intent.

### C. Elder Abuse

Relying again on their medical battery allegations, the Does additionally maintain Jane was a "dependent" adult while she was at the hospital and therefor also pleaded a claim under the Elder Abuse Act (Welf. & Inst. Code, § 15610 et seq.)  Although Jane sufficiently alleged a medical battery claim based on Dr. Kachru's performance of the vacuum-assisted

47

delivery, she did not allege Kachru acted with "recklessness, oppression, fraud, or malice" (*id.,* § 15657), required to state a claim under the Act.

The Elder Abuse Act "affords certain protections to elders and dependent adults." (*Winn v. Pioneer Medical Group, Inc.* (2016) 63 Cal.4th 148, 152 (*Winn*).) A "dependent adult" includes "any person between the ages of 18 and 64 years who is admitted as an inpatient to a 24-hour health facility." (Welf. & Inst. Code, § 15610.23, subd. (b).) It defines "physical abuse" as including several criminal offenses, including assault and battery (*id.*, § 15610.63), "neglect" as the "negligent failure of any person having the care or custody of an elder or a dependent adult to exercise that degree of care that a reasonable person in a like position would exercise" (*id.*, § 15610.57, subd. (a)(1)), and "abandonment" as "the desertion or willful forsaking of an elder or a dependent adult by anyone having care or custody of that person under circumstances in which a reasonable person would continue to provide care and custody" (*id.*, § 15610.05). The Act permits the recovery of damages (and attorney fees) by a plaintiff who can prove "by clear and convincing evidence that a defendant is liable for physical abuse . . . , neglect . . . , or abandonment . . . , and that the defendant has been guilty of recklessness, oppression, fraud, or malice in the commission of this abuse." (*Id.,* § 15657.)

In their complaint, the Does parroted the language of the statute, alleging that Dr. Kachru's "behavior was intentional, malicious, wanton, oppressive[], fraudulent, and/or reckless." They did not, however, allege any facts in support of these generic assertions. (See *Carter v. Prime Healthcare Paradise Valley, LLC* (2011) 198 Cal.App.4th 396, 410 (*Carter*) [allegations that hospital "acted 'recklessly' or 'fraudulently' " not sufficient to state elder abuse claim; court did not, in reviewing judgment of dismissal following the

48

sustaining of a demurrer, "assume the truth of contentions or conclusions of fact or law, such as those contained in [the] plaintiffs' pleadings"].)

In their briefing, the Does argue that, by its very nature, a vacuum-assisted delivery "poses significant risks to the health of the birthing woman and the fetus." And because Jane did not consent to such a delivery, they sufficiently alleged that Dr. Kachru engaged in recklessness, oppression, fraud, or malice for purposes of the statute. However, the Does, themselves, go on to acknowledge that a vacuum-assisted vaginal delivery "is not an evil in itself and can provide significant benefits in certain clinical circumstances."

The degree of opprobrium required for liability under the Elder Abuse Act is substantial. "[A] plaintiff must demonstrate by clear and convincing evidence that defendant is guilty of something more than negligence; he or she must show reckless, oppressive, fraudulent, or malicious conduct. The latter three categories involve 'intentional,' 'willful,' or 'conscious' wrongdoing of a 'despicable' or 'injurious' nature. [Citations.] [¶] 'Recklessness' refers to a subjective state of culpability greater than simple negligence, which has been described as a 'deliberate disregard' of the 'high degree of probability' that an injury will occur [citations]. Recklessness, unlike negligence, involves more than 'inadvertence, incompetence, unskillfulness, or a failure to take precautions' but rather rises to the level of a 'conscious choice of a course of action . . . with knowledge of the serious danger to others involved in it.' " (*Delaney v. Baker* (1999) 20 Cal.4th 23, 31–32; see *Carter, supra,* 198 Cal.App.4th at p. 404.)

Jane's allegations that she objected to a vacuum-assisted delivery, but Dr. Kachru nevertheless performed one, may be sufficient to plead an arguably unauthorized touching and, thus, a medical battery, but they are

49

insufficient to meet the significantly heightened degree of culpability required by the Elder Abuse Act. (See *Carter, supra,* 198 Cal.App.4th at p. 405 ["a plaintiff must prove more than simple or even gross negligence in the provider's care"].) Indeed, were we to accept the Does' reasoning, "recklessness, oppression, fraud, or malice" (Welf. & Inst. Code, § 15657) could be inferred any time a plaintiff alleges an obstetric provider delivered a baby with the assistance of a vacuum-assist device. The Does have not cited, nor are we aware of, any authority supporting such a construction of the Elder Abuse Act.

## D. False Imprisonment

Pointing to their allegations that Dr. Kachru pressured Jane to have a C-section or vacuum-assisted vaginal delivery without sufficient explanation as to why Kachru felt one or the other procedure was necessary, the Does claim the emotional pressure Jane felt to undergo one of these procedures amounted to Kachru restraining her and therefore Jane additionally stated a claim of false imprisonment. They also point to their allegations that Jane's ankles were placed in stirrups (but not by Kachru, rather by two unnamed defendants), and maintain Jane was also physically restrained. We conclude these allegations do not suffice to state a cause of action for false imprisonment.

"A person is falsely imprisoned if he [or she] is wrongfully deprived of his [or her] freedom to leave a particular place by the conduct of another." (*Schanafelt v. Seaboard Finance Co.* (1951) 108 Cal.App.2d 420, 422–423.) "The crime of false imprisonment is defined by Penal Code section 236 as the 'unlawful violation of the personal liberty of another.' The tort is identically defined." (*Fermino v. Fedco, Inc.* (1994) 7 Cal.4th 701, 715.) Thus, the elements of a tort cause of action of false imprisonment are: (1) the

nonconsensual and intentional confinement of a person, (2) without lawful privilege, (3) for an appreciable length of time, however short.  (*Ibid.*)

What the Does' allegations fail to account for with respect to false imprisonment is that Jane was "confined" to her delivery room regardless of whether her vaginal delivery was unaided or aided through vacuum-assist. In other words, we again agree with the trial court that the confinement about which Jane complains was within the scope of her authorization for obstetric care given on admission to the hospital.

The Does cite no authority, and we are aware of none, that remotely suggests allegations that Dr. Kachru told her she had to have an immediate vacuum-assisted delivery and her feet were placed in stirrups by attending medical staff, support a claim for false imprisonment.  Rather, the substance of the Does' allegations is that Kachru was wrong in her assessment that an immediate delivery was necessary, which precipitated the vacuum-assisted delivery and the medical staff's placing her feet in stirrups.  While Jane was free to allege Kachru's medical judgment fell below the standard of care, the Does never advanced such a cause of action.

The cases on which the Does rely are readily distinguishable—in none of them did the plaintiff voluntarily authorize any touching and confinement, as Jane did here on admission for obstetric care. *Fermino v. Fedco, Inc.*, *supra*, 7 Cal.4th 701, for example, involved allegations a personnel manager, loss-prevention manager, and two security agents "physically compelled" an employee to stay in a room for an hour while she was interrogated about theft allegations and told (falsely) that two witnesses had seen the theft.  (*Id.* at pp. 706–707.)  The employee repeatedly asked to leave the room and to call her mother, but her requests were denied, and one of the security guards "threw up a hand and gestured [the employee] to stop" when she tried to walk

51

toward the door. (*Id.* at p. 707.) Unlike here, in *Fermino* there was no allegation *any* interaction with these individuals was voluntary. The other cases on which the Does rely likewise involved interactions that were wholly nonconsensual. (E.g., *Maben v. Rankin* (1961) 55 Cal.2d 139, 141 [husband had wife involuntarily committed to psychiatric ward for two weeks where she was given electroshock treatments]; *Wilson v. Houston Funeral Home* (1996) 42 Cal.App.4th 1124, 1130, 1135 [grieving family got into limousine believing they were being taken to a cemetery for burial services but were instead driven to a bank "against their will and over their protests" where they were kept for 45 minutes while director of funeral home insisted on cash payment]; *Schanafelt v. Seaboard Finance Co.*, *supra*, 108 Cal.App.2d at pp. 422–423 [store manager seeking to collect debt blocked driveway of debtor who was pregnant, told her she could not leave or get food until after furniture was repossessed, and debtor was forced to remain in her house for about three hours waiting for the store's van to collect the furniture].)

### E. Intentional Infliction of Emotional Distress

The Does further claim their allegations support an intentional infliction of emotional distress claim against Dr. Kachru. Again, we do not agree.

The tort of intentional infliction of emotional distress has three elements: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff suffered severe or extreme emotional distress; and (3) the plaintiff's injuries were actually and proximately caused by the defendant's outrageous conduct." (*Cochran v. Cochran* (1998) 65 Cal.App.4th 488, 494.) " ' "Conduct, to be ' "outrageous" ' must be so extreme as to exceed all bounds of that usually tolerated in a civilized

52

society." ' [Citation.] In order to avoid a demurrer, the plaintiff must allege with 'great[] specificity' the acts which he or she believes are so extreme as to exceed all bounds of that usually tolerated in a civilized community." (*Vasquez v. Franklin Management Real Estate Fund, Inc.* (2013) 222 Cal.App.4th 819, 832 (*Vasquez*).) Stated differently, " 'Generally, conduct will be found to be actionable where the "recitation of the facts to an average member of the community would arouse his [or her] resentment against the actor, and lead him [or her] to exclaim, 'Outrageous!' " ' " (*Cochran*, at p. 494.)

While the Does enhanced their factual allegations with much emotionally laden and accusatory language, they did not allege *acts* by Dr. Kachru meeting the heightened standard required to state a claim for intentional infliction of emotional distress. Specifically, they alleged Kachru examined Jane vaginally, told Jane her baby needed to be delivered "now" by C-section or thru a vacuum-assisted vaginal delivery, despite Jane's objection to both procedures delivered the baby by vacuum assist, performed an episiotomy during the birth, pressed on Jane's abdomen after the birth to expel the placenta, inserted a catheter to drain urine, gave her an injection, and sutured in the vaginal area. These alleged acts, even collectively, fall short of conduct " ' "so extreme as to exceed all bounds of that usually tolerated in a civilized community." ' " (*Vasquez, supra,* 222 Cal.App.4th at p. 832.)

### F. Invasion of Privacy

Finally, the Does maintain their allegations against Dr. Kachru state invasion of privacy claims, both under our state constitution and the common law. As we explain, they do not.

53

### *California's Constitutional Right of Privacy*

"[A] plaintiff alleging an invasion of privacy in violation of the state constitutional right to privacy must establish each of the following: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy."  (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 39–40 (*Hill*).)

Whether the first element has been alleged may not be so easily determined.  As the high court explained, the first element requires "the identification of a specific, legally protected privacy interest.  Whatever their common denominator, privacy interests are best assessed separately and in context.  Just as the right to privacy is not absolute, privacy interests do not encompass all conceivable assertions of individual rights.  Legally recognized privacy interests are generally of two classes: (1) interests in precluding the dissemination or misuse of sensitive and confidential information ('informational privacy'); and (2) interests in making intimate personal decisions or conducting personal activities without observation, intrusion, or interference ('autonomy privacy')."  (*Hill, supra,* 7 Cal.4th at p. 35.)  As to the latter, the court stated, "The ballot arguments [in favor of adding privacy to the rights protected by Article 1, section 1 of the state constitution] refer to the federal constitutional tradition of safeguarding certain intimate and personal decisions from government interference in the form of penal and regulatory laws.  [Citation.]  But they do not purport to create any unbridled right of personal freedom of action that may be vindicated in lawsuits against either government agencies or private persons or entities."  (*Hill,* at p. 36.)  Thus, "[w]hether established social norms safeguard a particular type of information or protect a specific personal decision from public or private

54

intervention is to be determined from the usual sources of positive law governing the right to privacy—common law development, constitutional development, statutory enactment, and the ballot arguments accompanying the Privacy Initiative." (*Ibid.*)

Whether the second element—"a reasonable expectation of privacy on plaintiff's part"—has been alleged is, likewise, a multi-faceted inquiry. "Even when a legally cognizable privacy interest is present, other factors may affect a person's reasonable expectation of privacy. For example, advance notice" of an intrusion may limit an expectation of privacy. (*Hill*, *supra*, 7 Cal.4th at p. 36.) "In addition, customs, practices, and physical settings surrounding particular activities may create or inhibit reasonable expectations of privacy." (*Ibid.*) "A 'reasonable' expectation of privacy is an objective entitlement founded on broadly based and widely accepted community norms." (*Id.* at p. 37.) "Finally, the presence or absence of opportunities to consent voluntarily to activities impacting privacy interests obviously affects the expectations of the participant." (*Ibid.*)

As to the third element—a "serious" invasion of privacy— an invasion of privacy "must be sufficiently serious in [its] nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right. Thus, the extent and gravity of the invasion is an indispensable consideration in assessing an alleged invasion of privacy." (*Hill*, *supra*, 7 Cal.4th at p. 37.)

We bypass an examination of whether the Does alleged "a specific, legally protected privacy interest" and a "reasonable" expectation of privacy under the circumstances alleged, as they did not allege, by any measure, an invasion of Jane's privacy so serious it constituted "an egregious breach of the social norms" (*Hill*, *supra*, 7 Cal.4th at p. 37) underlying her asserted

autonomy privacy right. As we have summarized, as to Dr. Kachru, the Does alleged she examined Jane vaginally, told Jane her baby needed to be delivered "now" by C-section or a vacuum-assisted vaginal delivery, despite Jane's objection to both procedures Kachru delivered the baby by vacuum assist, performed an episiotomy during the birth, and thereafter pressed on Jane's abdomen after the birth to expel the placenta, inserted a catheter to drain urine, gave her an injection, and sutured in the vaginal area. These alleged acts, even collectively, do not rise to the level of "an egregious breach of [] social norms," (*ibid.*) particularly given the fact that by voluntarily being admitted to the hospital Jane impliedly authorized obstetric care.

None of the cases on which the Does rely suggests the kind of allegations they have made as to Dr. Kachru alleging a state constitutional claim for violation of Jane's autonomy privacy. Indeed, none even involved a cause of action for the invasion of privacy, and each referred to an individual's right to make medical decisions in a significantly different context. (See *Conservatorship of Wendland* (2001) 26 Cal.4th 519, 530–532 [in determining whether conservator had authority to withhold life-sustaining nutrition from conservatee under Prob. Code, § 2355, court observed that the state constitutional right to privacy encompasses the right to reject intrusions on bodily integrity]; *California Advocates for Nursing Home Reform v. Smith* (2019) 38 Cal.App.5th 838, 849, 861–862 [in analyzing constitutionality of statute setting forth procedures for nursing-home residents who lack capacity to make health-care decisions (Health & Saf. Code, § 1418.8), court acknowledged the privacy right of competent adults to refuse medical treatment]; *Stewart v. Superior Court* (2017) 16 Cal.App.5th 87, 104 [in analyzing a cause of action under Elder Abuse Act, court referred to common-law right of individual to determine one's own medical care].)

56

***Common Law Right of Privacy***

The common law tort of intrusion "has two elements: (1) intrusion into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person." (*Sanders v. American Broadcasting Companies* (1999) 20 Cal.4th 907, 914 (*Sanders*).)  As proof satisfying the second element, "[p]laintiffs must show more than an intrusion upon reasonable privacy expectations.  Actionable invasions of privacy also must be 'highly offensive' . . . , and 'sufficiently serious' and unwarranted as to constitute an 'egregious breach of the social norms.' " (*Hernandez v. Hillsides, Inc.* (2009) 47 Cal.4th 272, 295.)  Relevant factors include " 'the degree and setting' of the intrusion, and 'the intruder's motives and objectives.' " (*Ibid.*)

For much the same reasons that we have rejected Jane's constitutional privacy claim and her emotional distress claim, we also reject her common law intrusion claim.  Entering a birthing suite as part of the delivery team, making an assessment as to the state of labor and the condition of both the woman and baby, concluding immediate delivery is necessary and either a C-section or vacuum-assisted delivery is required, performing a vacuum-assisted vaginal delivery instead of a C-section after the mother objects to either, and performing immediate post-delivery procedures without asking Jane's consent, is not conduct that would be "*highly* offensive to a reasonable person." (*Sanders, supra,* 20 Cal.4th at p. 914, italics added.)

While Jane was offended by Dr. Kachru's alleged brusqueness on entering her room, her alleged failure to provide a full explanation of why she concluded Jane's baby needed to be delivered "now" by way of a C-section or vacuum-assisted vaginal birth, and her alleged lack of response to Jane's articulated pain during post-delivery procedures, these are complaints about

Kachru's bedside manner and professional judgment, not a claim that Kachru committed the common law tort of intrusion.

### G. Leave to Amend

As to leave to amend, the Does do no more than generically assert that when a demurrer is sustained leave to amend should be liberally granted. But, as we have noted, that is not the entirety of the governing standard. Both in the trial and on appeal, a party seeking leave to amend must demonstrate "a reasonable possibility" they can "cure the defect[s]" of their pleading "with an amendment." (*Schifando, supra,* 31 Cal.4th at p. 1081; *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 [" 'The burden of proving such reasonable possibility is squarely on the plaintiff.' "].) The Does made no attempt in the trial court to carry their burden. Nor have they done so in this court.

The Does cite *City of Stockton v. Superior Court* (2007) 42 Cal.4th 730, in support their assertion they should have been granted leave to amend simply because they had not previously amended their complaint with respect to Dr. Kachru. But *Stockton* involved "the unusual path of a writ petition challenging an order *overruling* a demurrer." (*Id.* at pp. 746–747, italics added.) Because the trial court's erroneous ruling on a legal issue did not foreclose the possibility that the plaintiff could amend the complaint to provide additional factual allegations, the court directed the trial court to grant the plaintiff leave to amend since it had not previously had the opportunity to do so. (*Id.* at p. 747.) The case does not, as the Does suggest, stand for the broad proposition that leave to amend must be liberally granted simply because a plaintiff has not previously filed an amended pleading, in the absence of any showing that there is "a reasonable possibility" they can

"cure the defect[s]" of their complaint "with an amendment." (*Schifando, supra,* 31 Cal.4th at p. 1081.)

As the Does have not made any showing as to additional facts they could allege to cure the deficiencies in the causes of action they have pursued on appeal, they have not demonstrated that the trial court abused its discretion in sustaining Dr. Kachru's demurrer without leave to amend.

## IV.    DISPOSITION

The judgment of dismissal as to Jane's cause of action for medical battery against Dr. Kachru is reversed to the extent it is based on Kachru's performance of a vacuum-assisted vaginal delivery over Jane's express objection.  In all other respects, the judgment is affirmed.  The case is remanded to the trial court for further proceedings consistent with this opinion.  Each side shall bear their appellate costs.

_____

Banke, Acting P.J.

I concur:

_____

Smiley, J.

A168669, Doe v. Kachru

## DISSENTING OPINION OF HUMES, P.J.

My only disagreement with the majority is with its affirmance of the dismissal of Jane's claim for gender violence under Civil Code[1] section 52.4. In my view, Jane stated a claim under the statute's plain language because the medical battery she alleged "would constitute a criminal offense" and was "committed at least in part based on" a "pregnancy, childbirth, or medical condition[] related to pregnancy or childbirth," circumstances explicitly included in the statutory definition of "gender." (§§ 51, subd. (e)(6), 52.4, subd. (d).) Section 52.4 provides a civil remedy for criminal obstetric battery, and the legislative history—to the extent it even needs to be scrutinized given the statute's plain language—supplies no reason to conclude, as the majority does, that the Legislature wanted to require plaintiffs claiming such a battery to allege and prove an additional element of gender animus that is nowhere to be found in the statute. At this early stage of the litigation, we don't know whether an obstetric battery actually occurred, but we do know one was alleged. I would therefore remand the matter and allow Kachru the opportunity to defeat the claim by providing evidence that she performed the vacuum-assisted delivery as a result of sound medical judgment, during a difficult and risky delivery and after accommodating Jane's demand to avoid a caesarean section.

The statutory language is clear. Under section 52.4, "[a]ny person who has been subjected to gender violence may bring a civil action for damages against any responsible party." (§ 52.4, subd. (a).) One way to prove a claim under the statute is to show that (1) the victim was subject to "[o]ne or more

---

[1] All further statutory references are to the Civil Code unless otherwise noted.

1

acts that would constitute a criminal offense under state law that has as an element the use, attempted use, or threatened use of physical force against the person . . . of another," and (2) the act or acts were "committed at least in part based on the gender of the victim."[2]  (§ 52.4, subd. (c)(1).)  For purposes of the statute, "gender" means "sex," which in turn is defined to include "pregnancy, childbirth, or medical conditions related to pregnancy or childbirth."  (§§ 51, subd. (e)(6), 52.4, subd. (d).)  When a statute "contains no ambiguity, we presume the Legislature meant what it said, and the plain meaning of the statute governs," without the need to consult legislative history.  (*People v. Robles* (2000) 23 Cal.4th 1106, 1111.)

As I see it, the complaint's allegations satisfy both requirements for stating a claim under section 52.4, subdivision (c)(1).  Starting with the first requirement, the majority and I agree that the complaint adequately alleged a medical battery based on the vacuum-assisted delivery.  (See *Pedesky v. Bleiberg* (1967) 251 Cal.App.2d 119, 124 [" '[W]here a person has been subjected to an operation without . . . consent[,] such an operation constitutes technical assault and battery' "].)  We also apparently agree that the battery alleged would constitute a criminal offense, even though the majority soft-pedals the complaint's allegations against Kachru.  The complaint alleged that Jane suffered "obstetric violence" and that Kachru performed the vacuum-assisted delivery not only without consent, but also with needless violence and in direct contravention of Jane's repeated pleas and directives.  The majority characterizes the allegations as a "disagree[ment]" over Kachru's "assessment of the situation and opinion Jane's baby needed to be

---

[2] Another way a plaintiff can prove a claim is by establishing "[a] physical intrusion or physical invasion of a sexual nature under coercive conditions."  (§ 52.4, subd. (c)(2).)

delivered immediately," but I view them as alleging a forceful intrusion while Jane was physically restrained against her will after repeatedly stating her objections to the procedure.

This matters because I don't accept the majority's conclusion that the scope of the statute must be judicially constrained to protect medical providers from "be[ing] automatically subject to a civil rights claim under section 52.4 if they are sued for medical battery for performing a procedure that allegedly exceeded the scope of the patient's authorization for obstetric care." I agree that had the complaint here failed to state a claim for a medical battery, it would have necessarily failed to state a claim under the gender-violence statute. But I'm not convinced that just because a complaint alleges an unauthorized touching in the context of obstetric care, it necessarily alleges a criminal medical battery as required for a gender-violence claim. Touchings that are part of medical care—where considerations of implied consent and the need to protect patient health and welfare apply—might be entirely appropriate even if they would not be in other contexts. Thus, I don't believe that medical providers would be "automatically subject" to a claim under section 52.4 whenever they were sued for an unauthorized obstetric touching.

But even assuming a claim under 52.4 can be easily stated when a claim for obstetric battery is alleged, I do not see why permitting Jane's gender-violence claim to proceed with her medical-battery claim at this stage of the case warrants the majority's hand-wringing. Both claims would be defeated if it can be shown, as the majority's characterization of the facts suggests, that Kachru acted as she professionally judged to be warranted in a

3

life- or health-threatening situation.[3]  (See *Conte v. Girard Orthopaedic Surgeons Medical Group, Inc.* (2003) 107 Cal.App.4th 1260, 1268.)  It's entirely plausible—perhaps even likely—that a factfinder would conclude, after considering additional evidence and possible expert testimony, that no battery occurred.  But we are reviewing the allegations at the pleading stage, where we must accept them as true.  (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 6.)  In my view, the resolution of the gender-violence claim, just like that of the medical-battery claim, turns on what the evidence ultimately reveals about the circumstances surrounding Jane's childbirth.

The complaint also satisfies the second requirement for stating a claim under section 52.4, subdivision (c)(1)—that the act was committed at least in part based on the victim's gender.  It does so because it alleges that the vacuum-assisted delivery occurred in connection with "childbirth," which is expressly included within the statutory definition of gender.

Because section 52.4's scope plainly encompasses a criminal battery "committed at least in part based on" the victim's giving birth, it is unnecessary to review the statute's legislative history for further guidance.  (See *People v. Robles*, *supra*, 23 Cal.4th at p. 1111.)  Nevertheless, that history is consistent with the statute's clear meaning.

---

[3] The complaint itself suggests Kachru may have so acted, as it recognizes that Jane's labor persisted almost two days and complications arose, including Jane's slight fever and the baby's elevated heartrate.  And it recognizes that Kachru acceded to Jane's demand not to perform a caesarean section and told Jane that the only way to avoid a caesarean section was to have a vacuum-assisted delivery.  Still, without further development of the facts, I cannot conclude as a matter of law that there was a justifiable reason for Kachru to override Jane's alleged emphatic demands not to be forced to have a vacuum-assisted delivery.

The definition of "gender" under section 52.4 has evolved. When the statute was first enacted in 2002, it defined "gender violence" but not "gender." (See Stats. 2002, ch. 842, § 2.) The Legislature's apparent intent at the time was to prevent and remedy more conventional forms of gender-related violence, such as domestic abuse and sexual assault. (See *id.*, § 1 [finding that existing law did not adequately prevent or remedy "gender-related violence, such as domestic violence," and that "[s]exual abuse harms many women, children, and families"].) This intent is evident because the statute was expressly enacted in response to the United States Supreme Court's decision in *United States v. Morrison* (2000) 529 U.S. 598 (*Morrison*) to invalidate the federal Violence Against Women Act of 1994 (former 42 U.S.C. § 13981). (*Morrison*, at pp. 601–602, 605; see Assem. Com. on Judiciary, Rep. on Assem. Bill No. 1928 (2001–2002 Reg. Sess.) as amended Apr. 4, 2002.) That federal law, which addressed violent crimes "due, at least in part, to an animus based on the victim's gender" (former 42 U.S.C. § 13981(d)(1)), was "the most ambitious and most visible attempt ever made in this country to apply the discrimination model to violence against women." (Sally F. Goldfarb, *Applying the Discrimination Model to Violence Against Women: Some Reflections on Theory and Practice* (2003) 11 Am. U. J. Gender Soc. Pol'y & L. 251, 253.)

Although section 52.4 was enacted in direct response to *Morrison*'s invalidation of the Violence Against Women Act, it does not replicate the federal law but instead expands upon it. Not only does section 52.4 not include a similar "animus" requirement, but it also has since been amended to expand its definition of "gender." Effective 2016, the Legislature amended section 52.4 to define gender to have the meaning set forth in the Unruh Civil Rights Act (§ 51). (See Stats. 2015, ch. 202, § 1.) The legislative history

5

suggests this amendment was aimed primarily at expanding the definition of gender to include sexual orientation. (E.g., Legis. Counsel's Dig., Assem. Bill No. 830 (2015–2016 Reg. Sess.).) Defining gender to include sexual orientation clearly shows that the Legislature intended to expand section 52.4's applicability to classifications not included in the concept of "gender" as ordinarily understood.[4]

In fact, the circumstances of pregnancy and childbirth are far more closely connected to constructs of gender than is sexual orientation, even if they are not typically used to define the term. True enough, the legislative history is silent about the inclusion of pregnancy and childbirth into the definition of gender for purposes of section 52.4, but there's no question that the Legislature intended to incorporate the Unruh Act's *full* definition of gender, which plainly declares that " '[g]ender' means sex," and " '[s]ex,' " in turn, "includes . . . pregnancy, childbirth, or medical conditions related to pregnancy or childbirth." (§ 51, subd. (e)(6).) It may be correct, as the majority notes, that the scenario alleged in the complaint was not "remotely like those described in the legislative history," but that does not mean that the Legislature intended to exclude obstetric battery from the statute's reach. And even if little consideration was given to the precise issue, "[t]he limits of the drafters' imagination supply no reason to ignore the law's demands." (*Bostock v. Clayton County* (2020) 590 U.S. 644, 653.)

The majority finds ambiguity in section 52.4 because the alleged criminal act must be "at least in part based on" gender. (§ 52.4, subd. (c)(1).) It thinks this language, coupled with the legislative history, somehow shows

---

[4] A person's sexual orientation, of course, has little to do with their gender. Sexual orientation refers to the types of sexual or romantic attraction a person has, while gender refers to a person's social identity as, for example, male, female, or non-binary.

that the Legislature did not intend for a gender-violence claim against an obstetric provider to proceed without an allegation of some sort of gender animus in addition to, and separate from, allegations of a criminal act of physical force that was inflicted at least in part based on the victim's obstetric circumstance. To me, this is unwarranted speculation that flies in the face of the statute's language and evolution. I accept neither the majority's premise that the Legislature was unaware of what it was doing when it expanded the definition of gender to include childbirth, pregnancy, and related conditions, nor its conjecture that the Legislature intended to impose additional pleading and proof requirements on plaintiffs who allege obstetric batteries.

The majority points to extensive legislative history showing that section 52.4 was intended to provide a remedy for acts of violence motivated by gender bias. But while this of course is true, it does not support the conclusion the majority derives from it. What the majority overlooks is that the Legislature could have legitimately considered obstetric battery to be a type of gender violence, and then addressed it systemically by defining gender violence—as the statute expressly does—to be *itself* a form of discrimination. (See § 52.4, subd. (c).)[5] Given the statute's explicit recognition that gender violence is a form of discrimination, I find unpersuasive the majority's leap in presuming that the Legislature intended that further, unspecified allegations of discriminatory gender animus *also* be alleged to state a claim for obstetric violence.

---

[5] An alleged criminal medical battery *not* involving pregnancy, childbirth, or related medical conditions (including gender-specific medical procedures such as hysterectomies and vasectomies) would require an allegation that the battery was otherwise "in part based on" a victim's gender, such as the person's status as a male or female. (§ 52.4, subd. (c)(1).)

"Obstetric violence" is a term describing the mistreatment of pregnant and birthing women, and it recognizes that "individual instances of obstetric abuse are part of the broader problem of gender-based violence because they 'bring[] with [them] loss of autonomy and the ability to decide freely about [women's own] bodies and sexuality.' . . . [A]buse in obstetric and gynecological care is a type of violence often left out of the conversation about violence against women. Moreover, the definition of obstetric violence as a subset of gendered violence highlights that it is also a type of structural violence and, therefore, needs to be addressed systemically." (Maria T.R. Borges, *A Violent Birth: Reframing Coerced Procedures During Childbirth As Obstetric Violence* (2018) 67 Duke L.J. 827, 830, fns. omitted; see, e.g., Elizabeth Kukura, *Obstetric Violence* (2018) 106 Geo. L.J. 721, 725; Alexa Richardson, *The Case for Affirmative Consent in Childbirth* (2022) 37 Berkeley J. Gender L. & Just. 1, 7–8.) I find it unsurprising, and eminently reasonable, for the Legislature to have amended section 52.4—the very purpose of which is to address gender violence—to discourage and redress the clearest type of obstetric violence, acts of physical force that "constitute a criminal offense under state law." (§ 52.4, subd. (c)(1).)

In short, I would apply the plain language of section 52.4 and conclude that the allegations that Kachru performed the vacuum-assisted delivery over Jane's protestations were sufficient to avoid dismissal, because they alleged a criminal battery that was inflicted at least in part based on Jane's giving birth. (See §§ 51, subd. (e)(6), 52.4, subds. (c)(1), (d).) If Jane does not file a petition for review, I urge the Supreme Court on its own motion to grant review to consider the important questions this case raises about the scope of the gender-violence statute. (Cal. Rules of Court, rule 8.512(c)(1).)

8

Dissenting:

_____

Humes, P.J.

Trial Court: City and County of San Francisco Superior Court

Trial Judge: Hon. Richard B. Ulmer Jr.

Counsel:

J. Cantor Law, Julie D. Cantor; Perkowski Law Office, Jean Leora Perkowski, for Plaintiff and Appellant.


Cole Pedroza LLP, Amy Elizabeth Rankin and Kenneth Robert Pedroza; Schuering, Zimmerman and Doyle, Sarah C. Gosling and Thomas Jospeh Doyle, for Defendant and Respondent.